(No. 69923.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROOSEVELT LUCAS, Appellant.

*Opinion filed September 24, 1992.—Rehearing denied November 30, 1992.*

Michael J. Pelletier, Deputy Defender, and Patricia Unsinn, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Bradley P. Halloran, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

On October 16, 1987, defendant, Roosevelt Lucas, was indicted on two counts of conspiracy (Ill. Rev. Stat. 1987, ch. 38, par. 8—2(a)) and five counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)). The conspiracy counts were nol-prossed by the State prior to trial. Defendant was accused of killing Robert Taylor, a superintendent at the Pontiac Correctional Center (Pontiac) on September 3, 1987. Taylor died as a result of a stab wound to his heart and suffered multiple lacerations to the scalp caused by a blunt instrument.

Upon a defense motion for change of venue, the cause was transferred to Grundy County from Livingston County. Following a jury trial, defendant was convicted of first degree murder. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty on the ground that defendant's victim was a correctional officer, a statutory aggravating circumstance. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(2).) The jury concluded that there were no mitigating factors sufficient to preclude imposition of the death penalty, and the trial judge therefore sentenced defendant to death. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).

Superintendent Taylor was killed in his office at Pontiac on the morning of September 3, 1987. A "shank," or homemade knife, was recovered from the office and identified as the weapon used to murder Taylor. At trial, the State presented a significant amount of evidence tying another inmate to Taylor's murder. That inmate, Ike Easley, had been tried separately and convicted of murdering Taylor in a trial that preceded defendant's trial. (See *People v. Easley* (1992), 148 Ill. 2d 281.) Easley and defendant were originally codefendants in the State's prosecution of Taylor's murder, but their cases were severed before trial. The prosecution presented essentially the same evidence at defendant's trial as it had at Easley's. Rather than repeat the evidence recounted in the opinion in *Easley* and duplicated at defendant's trial, we shall only refer to that evidence which is relevant to the resolution of the issues defendant raises on appeal.

The following evidence was adduced during the State's case in chief. Pontiac inmate Lawrence Spillar testified as to the following events occuring sometime prior to 11 a.m. on September 3, 1987. Spillar went to

Taylor's office, a converted inmate cell in the south cellhouse on gallery five, to discuss his painting detail. Taylor called a second inmate, Charles Nealy, into his office. As the three men talked, Easley ran into the office, jumped across Taylor's desk and hit him in the face with his fist. Nealy turned and ran out of the office and into his cell, number 546. Easley then pulled a knife from his waistband and began to stab Taylor.

Spillar got up to leave the office, but collided with defendant as he was coming in the office doorway. After a brief struggle, Spillar stepped aside and let defendant enter the office. Defendant proceeded to beat Taylor on the head with a pipe. Spillar testified that he stood on the gallery outside of Taylor's office, and observed Easley as he exited the office and ran towards the front of the gallery. He then saw defendant exit the office, turn and throw the pipe into the office, and run down the gallery. At the end of the gallery, defendant jumped up to gallery seven. Spillar then joined Nealy in cell 546.

Inmate Demetre Brown was on gallery five outside of Taylor's office when the murder occurred. Brown testified that he saw Easley and defendant on the gallery near Taylor's office prior to the attack. Both men wore hats and gloves. From outside Taylor's office, Brown saw Easley stab Taylor and saw defendant hit him on the head with a pipe. Brown then went into his cell, number 549. From there, he saw Easley and defendant run to the front of the gallery, discarding hats and gloves as they ran. Brown testified that he left his cell and joined Spillar and Nealy in cell 546 after the correctional officers came on the gallery.

Correctional Officer Walter Turner testified that approximately one hour before the attack on Taylor, he had seen defendant with two other inmates on gallery five. On cross-examination, he testified that Easley had also been with defendant and that the four men had gone

into Taylor's office. Turner and other staff members removed the men from Taylor's office and defendant went out to the yard.

Correctional Captain Donald Whitaker testified that he was on gallery six when he heard the call that Taylor was down. He had been in Taylor's office talking to him only 10 or 15 minutes prior to the attack. Several inmates were also in the office and defendant was in the area. Whitaker testified that he cleared the area.

After leaving Taylor's office, Whitaker went to gallery six and telephoned Taylor because he was concerned for Taylor's safety. He felt that "the mood was not right" in the south cellhouse. The day before, an officer who was assigned to the cellhouse had been assaulted by an inmate. Whitaker spoke with Taylor and asked him to go to lunch with him, but Taylor declined, saying that he could not leave his office at the time. Defendant objected at one point in Whitaker's testimony, arguing that no question was pending in response to one of Whitaker's answers. Other than this, defendant did not object to Whitaker's testimony about the attack.

Immediately after the attack on Taylor, the correctional officers conducted a lockup, securing all the inmates in their cells. Correctional officer Robert Baremore testified that while he was assisting in the lockup, Brown called to him in a loud voice from cell 546 and asked Baremore why he wanted to know his inmate number. Baremore had not asked Brown for his inmate number, so he approached the cell, believing that Brown wished to speak to him. Brown said to him in a low voice, "They're in here," and pointed to a curtain drawn across the rear of the cell. At Baremore's direction, Nealy and Spillar came from behind the curtain. Brown testified that what he meant by the statement was that he was not alone and that he did not want to speak to a correctional officer in front of other inmates.

Whitaker testified that he saw Brown standing at the front of cell 546. Nealy and Spillar went to the back of the cell as Whitaker approached it. Talking in a whisper, Whitaker asked Brown if Nealy and Spillar had committed the murder and Brown said no, but that he knew who had.

Approximately one-half hour after the attack, Correctional officer Don Lyons observed defendant in his cell, naked from the waist up, washing his arms, torso and hands. Defendant was calm and made no effort to conceal the fact that he was washing himself. Lyons testified that defendant's activities were unusual because all the inmates on gallery seven had been given the opportunity to shower that morning. On cross-examination, Lyons testified that he did not know whether defendant had showered that morning. While defendant was washing himself, other inmates on gallery seven were at the front of their cells with mirrors asking each other what had occurred.

Deputy Director Donald Long testified that he arrived at Pontiac between 12:30 p.m. and 1 p.m. and immediately went to the south cellhouse where he was briefed. Initial interviews were set up with all the inmates on the galleries at the time of the murder. In his preliminary interview, at which Long was present, Brown said he knew who had murdered Taylor but that he wanted to make a deal before he cooperated. Long told him there would be no deals, whereafter Brown refused to cooperate. Read, who conducted the initial interview with Brown, gave substantially the same account.

During a second interview that afternoon, Brown identified defendant from photographs as one of Taylor's assailants. Spillar provided the same information during the second round of interviews. Long testified that after providing the Department with the information, Brown

and Spillar were immediately transferred to separate institutions for their safety. Spillar was transferred a second time for safety concerns.

The State also elicited evidence from its witnesses concerning gang activity at Pontiac and specifically, defendant's involvement in this activity. The prosecutor revealed in opening argument that the State's theory was that Taylor's death was carried out by the Black Gangster Disciples (BGD) in retaliation for the death of a BGD inmate, Billy "Zodiac" Jones. The prosecutor argued that defendant was a BGD.

Sergeant Danny Jarrett testified as to the circumstances surrounding Jones' death. On July 20, Jones and his cellmate, Curt Williams, were being relocated from their cell to segregation. Jarrett, who participated in the relocation, testified that Williams became angry when the officers attempted to remove him from his cell. Other inmates on the gallery began to throw debris from their cells and chant "GD, one love," and "[C]ut one of us, we all bleed." With the aid of mace, the two men were removed from their cell. Jones collapsed and died outside the south cellhouse. An autopsy revealed he died as a result of ingesting a bag of cocaine.

Jarrett testified that following Jones' death on July 20 until August 19, when he was transferred to another unit, he received threats from BGD members that "we [Pontiac officers] had killed one of theirs [BGD], now they were going to take care of one of ours." Jarrett also testified that he heard other staff members threatened. He could not identify defendant as one of those who chanted when Williams was being moved, nor could he identify defendant as having threatened him. Jarret testified that defendant was a frequent companion of Williams and Jones.

Harry Martin, a former member of the BGD, testified that defendant was a member of a select group of the

gang's security enforcers, the UFO. Martin testified that in August 1987, when he was an inmate at Pontiac, he had a conversation with Corywn Brown, another inmate at Pontiac whom Martin identified as the "co-chairman" of the BGD at Pontiac.

According to Martin's testimony, he was told by Corywn Brown that the BGD hierarchy at Pontiac was "hostile"; it held the administration responsible for Jones' death and wanted to "retaliate against the administration." Martin testified that "[defendant] was standing with us at the time" of the conversation. No objections were made to this part of Martin's testimony.

Martin was then transferred from Pontiac to Logan Correctional Institute where Spillar had also been transferred. In September 1987, BGD inmates came to his cell and told him of a plan to kill Spillar for his part in cooperating with the Department. The inmates planned to poison Spillar's food, but Martin told them that Spillar should be allowed to live. Defendant initially made a hearsay objection when the prosecution asked Martin what the BGD had told him, which objection was sustained. Defendant did not make any further objections when the prosecution asked Martin what their plans were with respect to Spillar.

The State introduced additional evidence to corroborate its theory that Taylor's murder was a BGD retaliation. Long supervised the investigation of Taylor's murder and testified that his investigation revealed that "the motive, as shown through the investigation, was that the murder of [Taylor] was a direct result of the death of inmate [Jones]." Defendant made an initial foundation objection, which was sustained, but did not object to Long's testimony as to the motive for Taylor's murder. He also testified that after Spillar was transferred to Logan, he received information from a confidential source that the BGD had put a death hit on him, which informa-

tion resulted in Spillar's transfer to another penal institution. Defendant objected to Long's testimony in this area, which objection was overruled.

Read testified on cross-examination that during his second interview with Demetre Brown on the day Taylor was murdered, Brown told him that the BGD thought that Jones had been murdered by staff members. Read also testified that Brown told Read that he had heard BGD openly threatening Pontiac administrators prior to Taylor's murder, and that he believed that Taylor had been killed in retaliation for the death of Jones. No objections were made to Read's testimony.

The State introduced testimony indicating that a large amount of physical evidence had been removed from the scene of the murder and from certain inmates' cells. None of the physical evidence connected defendant with the murder.

After the State rested, Darryl Knighten testified for the defense. Knighten, an inmate at Pontiac, testified that on the morning of Taylor's murder, as he was waiting to be let onto gallery five, he heard a noise and turned to his right. He saw Taylor lying on the ground in front of his office. Knighten saw an inmate exit a cell a few doors down from Taylor's office, walk into the office, then return and stand by Taylor. The inmate went over to a wall in the area of the body and reached for an object. The inmate then noticed Knighten watching him, and walked back to his cell. Knighten did not identify the object the inmate was reaching for or whether he removed it from the area of Taylor's body.

Louis Roberson, an inmate at Pontiac, also testified. On the day of the murder, he was housed in cell 708. An inmate, who was on gallery five, called up to Roberson on gallery seven and asked him for a cup of coffee. On his way to his cell to make the coffee, Roberson passed defendant's cell and saw him seated in it. While he was

in his cell, Roberson heard some noise and he stepped outside his cell to find out the source of the noise. He saw other inmates looking onto the lower gallery and he saw Taylor lying on the ground. While he was on gallery seven looking down on gallery five onto Taylor's body, he saw defendant standing at the front of his cell.

Roberson testified on cross-examination that when he was interviewed in connection with the murder on September 7, 1987, he told the investigators that he saw defendant in cell 710 when he left his cell to investigate the noise he heard. He was not certain, however, what the noise was, whether it was the attack on Taylor or whether it was the sound of guards running down gallery five responding to the call that Taylor had been attacked. In fact, he did not know when Taylor was attacked, only that he saw defendant in his cell when he heard the noise.

After the jury found defendant guilty of first degree murder, a capital sentencing hearing was conducted. At the first phase of the hearing, the jury found defendant eligible for a death sentence.

In aggravation, the State introduced evidence of defendant's prior criminal conduct and institutional violations. Defendant had been convicted of robbery, bail jumping and theft, for which he received three concurrent sentences of three years' imprisonment, and murder and armed robbery, for which he received a sentence of 80 years. In mitigation, several members of defendant's family and a clinical psychologist testified. Neurological and psychiatric tests were performed on defendant. No evidence of significant brain damage or dysfunction, or serious psychiatric disturbances or thought disorder were found, although defendant did suffer from a learning disability which had first been identified when he was in fifth grade.

After hearing argument of counsel and being instructed by the court, the jury imposed a sentence of death. Defendant now appeals from that judgment.

Defendant's first argument on appeal involves the State's theory of the motive for Taylor's murder. Defendant argues that Jarrett's testimony regarding threats he received from BGD members was improperly introduced in support of the State's motive theory.

The general rule that prior threats by an accused to do violence to the person eventually slain are admissible applies when the statements are introduced to show malice or criminal intent. The factors a court considers in determining whether the statements are relevant to show malice or criminal intent include whether (1) the defendant made the statement, (2) the statement was a threat, (3) the statement was made close in time to the crime, and (4) the victim was threatened. See *People v. Lampkin* (1983), 98 Ill. 2d 418 (threat made by the defendant held inadmissible as evidence of malice and criminal intent where the threat was too general and impersonal to be reasonably characterized as directed toward anyone in particular, and was made six years prior to the murder for which the defendant was on trial).

In *People v. Nitz* (1991), 143 Ill. 2d 82, 123, this court allowed statements made by the defendant to be admitted at trial to show evidence of motive. This court subjected the statements to the same evidentiary standards as those introduced to demonstrate malice or criminal intent, implicitly recognizing that the concepts are closely related. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §401.15, at 162 (5th ed. 1990).) In *Nitz*, the defendant made the statements that were introduced to show motive and the statements were made close in time to the crime: "[D]efendant's statements *** continued up to and after the victim's homicide. Thus,

they were relevant and probative." *Nitz*, 143 Ill. 2d at 123.

We do not believe the same can be said about the statements at issue in this matter. Like those in *Nitz*, the statements were introduced as evidence of motive, not as evidence of criminal intent or malice. Jarrett testified specifically that defendant did not make the threats directed at him or those he heard directed at other guards. There was no testimony that Taylor was the recipient of any threats from defendant. Moreover, we do not believe that Taylor's murder, occurring more than two months after Jones' death, was close in time, especially since the threats Jarrett testified to stopped August 19, two weeks before Taylor's murder.

We find, therefore, that Jarrett's testimony regarding threats he received or those that he heard was improperly admitted. In this case, however, the admission did not affect the outcome of the trial, and we hold that the erroneous admission of the evidence was harmless. The admission of Jarrett's testimony about the threats he heard and received did not affect the result of this matter. They did not go to the heart of the case; whether the jury believed that Jarrett was threatened by a BGD member, it still had to decide whether defendant had murdered Taylor. The proof of defendant's guilt was overwhelming. There was direct identification of defendant by two eyewitnesses as having seen defendant in Taylor's office and beat him over the head with a pipe. One defense witness testified that he saw an inmate walking around Taylor's body after he had been attacked and another testified that he saw defendant in his cell around the time of the murder, although he did not know when the attack took place. This evidence can hardly be equated to the testimonies of two witnesses present when the attack occurred. We conclude that the admis-

sion of Jarrett's testimony about the BGD threats was harmless.

Defendant next argues that evidence of his gang membership and the circumstances surrounding the death of Jones was highly inflammatory with little or no probative value and was impermissibly allowed into evidence.

Recently, this court considered an almost identical issue in *People v. Easley* (1992), 148 Ill. 2d 281, the prosecution of Ike Easley for Taylor's murder. In *Easley*, the State argued that the motive for Taylor's murder was retaliation by the BGD for Jones' death. In that opinion, this court held that the State failed to prove its conspiracy theory; therefore, the evidence relating to gangs was irrelevant and highly prejudicial, and improperly admitted.

In *Easley*, this court noted that the State failed to demonstrate that the defendant had participated in and had knowledge of the BGD plan to murder a prison officer. Although the State presented substantial evidence in the form of testimony identifying Easley as a BGD member, it was from Pontiac officers whose opinion it was that Easley was a member of the BGD. The State also failed to show that Easley had been present at any BGD meetings, much less at a meeting at which plans to retaliate were developed and discussed.

The State presented substantially the same evidence in this matter as it did in *Easley* with the exception of one witness. Harry Martin did not testify in *Easley*. Whereas in *Easley*, the State failed to link defendant with any BGD plan to "retaliate" against the Pontiac administration for the death of Jones, Martin's testimony in this matter provided just such evidence as well as evidence that defendant was present at a meeting where the conspiracy was discussed.

Moreover, whereas the defendant in *Easley* never acknowledged that he was a member of the BGD, defendant in this matter concedes this both during trial and in his brief to this court. Defendant objected repeatedly throughout trial to the introduction of evidence offered to link him with the BGD. However, during the State's case in chief, the court conducted an *in camera* inspection of some materials seized from defendant's cell, which included a certificate the State argued was evidence of his membership in the BGD. Defendant objected to admission of the certificate on grounds of relevance, stating, "there's no denial of gang affiliation, so I don't see the point of producing [the certificate.]" The court ruled that the certificate was admissible, subject to the State's establishing that the certificate was one of membership in the BGD.

It is unreasonable to argue that defendant's membership in the BGD was of no probative value. Evidence of gang affiliation and/or gang involvement in gang-related activity is relevant if it tends " 'to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " (*People v. Monroe* (1977), 66 Ill. 2d 317, 322, quoting Fed. R. Evid. 401; *People v. Smith* (1990), 141 Ill. 2d 40, 58.) Evidence of defendant's status as a BGD member coupled with the evidence of defendant's presence at a meeting where plans to "retaliate against the administration" were discussed make evidence of BGD activities and the circumstances surrounding the death of Jones probative and, therefore, relevant. Accordingly, we hold that testimony was properly admitted into evidence.

Defendant next argues that the State buttressed its motive theory with incompetent evidence. Specifically, defendant argues that the following are examples of improperly admitted hearsay evidence: Long's testimony

that his investigation revealed that Taylor's murder was in retaliation for Jones' death; Jarrett's testimony about the threats he received from other inmates; Martin's testimony about his conversation with Corywn Brown; Read's testimony about his interview with Demetre Brown; Whitaker's testimony about the assault on another correctional officer the day before Taylor was murdered; and Long's and Martin's testimonies that the BGD had ordered Spillar's death.

Our review of the record reveals that defendant has failed to properly preserve these issues for review. For example, although defendant raised an objection to the testimony of Martin in his post-trial motion, he failed to object to Martin's testimony at trial. We find therefore that he has waived this hearsay objection for review. *People v. Enoch* (1988), 122 Ill. 2d 176, 187.

Likewise, defendant failed to object at trial to those portions of Read's and Whitaker's testimonies to which he now takes issue. In addition, he failed to specify the grounds for review of these testimonies, as well as Long's, in his post-trial motion. Although defendant argues in his reply brief that a "pervasive theme of [his] post trial motion was that the [trial] court had wrongly permitted the State to introduce hearsay evidence that Jones' death was the motive for the murder of Taylor," this court has repeatedly held that a defendant must allege the specific ground for review. (*People v. Caballero* (1984), 102 Ill. 2d 23, 41.) In his post-trial motion, defendant merely states that "the [trial] Court erred" in permitting the prosecution to introduce "inadmissible hearsay testimony."

Clearly, defendant's failure to make timely objections to the testimonies he now complains of and to renew the objections in a post-trial motion operates as a waiver of the right to raise the issue as a ground for reversal on review. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209.)

Contrary to defendant's arguments, the plain error rule is inapplicable in this matter.

The plain error rule permits a reviewing court to consider issues waived for purposes of review in two circumstances. (*Herrett*, 137 Ill. 2d at 209.) First, where the evidence in a criminal case is closely balanced, a reviewing court may consider a claimed error not properly preserved so as to preclude argument of the possibility that an innocent man may have been wrongly convicted. The rule may also be invoked where the error is so fundamental and of such a magnitude that the accused was denied a fair trial. *Herrett*, 137 Ill. 2d at 210.

The evidence in this matter was plainly not closely balanced. As we discussed in our harmless error analysis above, there was direct identification of defendant by two eyewitnesses as having seen defendant in Taylor's office and beat him over the head with a pipe.

Nor do we believe that the error was so fundamental and of such a magnitude that the accused was denied a fair trial. (*Herrett*, 137 Ill. 2d at 210.) All of the hearsay testimony of which defendant complains was introduced, as defendant notes, to buttress the State's motive theory. While evidence of motive may be helpful to understand the reason why a crime was committed, it is not essential to conviction. Had this evidence been excluded, the evidence in support of defendant's conviction remains. The fact that this evidence was admitted did not affect the outcome of the case. Therefore, the plain error rule is not applicable for review of defendant's claimed errors.

Defendant next argues that admission of evidence that defendant, as a member of the UFO, had a violent character denied defendant a fair trial where his character was not an issue; evidence of a witness' personal assessment of defendant's character was improperly admit-

ted; and the conclusion that defendant was a member of the UFO was speculation.

At trial, Martin identified defendant as a member of the UFO, the security arm of the BGD.

"MARTIN: I was going to the dining room and Corywn Brown came to me as I was coming out of the cellhouse to brief me on what was going on inside the institution. At that time he [Brown] had trailing him [defendant] and another guy, and they were security. Any time the chairman or co-chairman or a board member goes somewhere in the institution they have a security personnel from the UFO staff they call it.

Q. What is security?

A. They protect you. They carry weapons, and they protect the board members. It's just like the President has his security.

* * *

Q. What was the UFO function?

A. The UFO was a group of people chosen to be a part of a security group. The functions consisted of protecting board members, carrying out contracts on employees or people in other organizations, violations, which is assaults against members who didn't do what we told them to do, extortions, or any contracts that we may have had and people wouldn't pay then they would take out the physical part of that.

* * *

Q. What are the qualifications?

A. Loyalty to the organization, someone who is usually quiet and kept to themselves, and physically capable of taking care of theirselves in a physical encounter. Someone else who has had considerable amount of time although he has had past experiences in violent crimes in the past."

Generally, character evidence is inadmissible when a party's character is not in issue. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473.) The prosecution may not present evidence of a defendant's bad character until the

defendant puts his character in issue by presenting evidence of good character. (*People v. Lewis* (1962), 25 Ill. 2d 442; *People v. Barrow* (1989), 133 Ill. 2d 226.) Where it is admissible, evidence of character is confined to proof of general reputation at or prior to the alleged offense. It should also be confined to a time not very remote from the date of the alleged offense. The personal opinion of a witness and evidence of specific acts are not proper. (*People v. Willy* (1921), 301 Ill. 307.) Reputation evidence may not be based upon specific acts of either bad conduct or good conduct. *People v. Whiters* (1990), 204 Ill. App. 3d 334.

Defendant's character was not an element of the offense of murder. Martin's testimony was presented as part of the State's case in chief; defendant did not invite introduction of evidence of his bad character or propensity to violence by placing his character in issue. Martin's testimony identifying defendant as a UFO member and describing the qualifications and responsibilities of the UFO was nothing more than an effort by the State to portray defendant as a person capable of murdering Taylor and thereby persuading the jury that his propensity for violence made it likely that he was guilty as charged.

In fact, defendant objected to Martin's testimony on this issue, and in arguments on the objection, the State admitted that it sought admission of the UFO evidence on the grounds that it was "probative of whether or not [defendant is] the type of [BGD member] that would be involved from his gang standpoint in a hit on the administration, in this instance Superintendent Taylor."

Despite our conclusion, however, that the evidence was improperly admitted, we do not believe its introduction denied defendant a fair trial. The evidence of defendant's guilt, as we noted above, was direct and overwhelming. Additionally, although evidence of defend-

ant's *character* was improper, *i.e.*, evidence that defendant possessed character traits that made it likely that he was a member of the UFO was inadmissible, we have previously concluded that evidence of defendant's gang affiliation was proper. Evidence that defendant was a member of the UFO was relevant and probative and, therefore, admissible.

Defendant next argues that admission of collateral crimes which were not connected to defendant or proved related to Taylor's murder denied defendant his right to a fair trial.

Whitaker testified during the State's case that the day before Taylor was murdered, an officer assigned to the south cellhouse was attacked by a BGD member. The State also introduced evidence that after Spillar was transferred from Pontiac, the BGD at this second correctional facility planned to kill him in light of his cooperation with the Pontiac administration. Defendant argues that because there was no evidence that he committed these crimes or participated in any of the surrounding acts, and because there was no evidence that they were connected with Taylor's murder, admission of the evidence deprived him of a fair trial.

Evidence of the commission of other crimes, wrongs or acts is inadmissible for the purpose of showing a disposition or propensity to commit crimes, thus suggesting an inference that the defendant therefore committed the crime in question. (*People v. Thingvold* (1991), 145 Ill. 2d 441; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §404.5, at 190 (5th ed. 1990).) The underlying rationale is that such evidence is objectionable " 'not because it has no appreciable probative value, but because it has too much.' " *People v. Romero* (1977), 66 Ill. 2d 325, 330 (quoting *People v. Lehman* (1955), 5 Ill. 2d 337, 342, quoting 1 J. Wigmore, Evidence §194 (3d ed. 1940)).

Even though generally not admissible, evidence of other crimes may be admitted if it is relevant to show such facts as motive, intent or identity. (*People v. Mc-Donald* (1975), 62 Ill. 2d 448; *People v. Tranowski* (1960), 20 Ill. 2d 11.) However, it is inadmissible even for a proper purpose until it is shown that a crime actually took place and that defendant committed it or participated in its commission. *People v. Miller* (1977), 55 Ill. App. 3d 421.

There was no evidence connecting defendant to the attack on the officer the day before Taylor's murder. Similarly, there was no evidence connecting defendant to the plan to poison Spillar. While evidence of a plan to eliminate witnesses is admissible to show a consciousness of guilt where the scheme is connected to the defendant, absent such a connection, the plan is not probative of the defendant's consciousness of guilt and should be excluded from evidence. Compare *People v. Baptist* (1979), 76 Ill. 2d 19 (evidence that the defendant's brother and sister executed a plan to kill the State's eyewitnesses was admissible where a letter written by defendant to a family member of one of the eyewitnesses, threatening to have his brother and cousin harm the eyewitnesses if he testified, connected the defendant to the shootings), with *People v. Frazier* (1982), 107 Ill. App. 3d 1096 (evidence that the defendant tried to pay complainant $1,000 in return for an agreement to drop the charges not admissible as evidence of his consciousness of guilt where it was the complainant who suggested the payment).

Although we believe the State failed to connect the plan with defendant, we conclude that introduction of the evidence was harmless. With respect to the testimony from Martin regarding the BGD plan to poison Spillar, the trial court struck a portion of Martin's testimony on this matter and instructed the jury to disregard

any testimony that involved plans by the BGD to poison Spillar. We do not agree with the State's position that the trial court instructed the jury to disregard only that evidence pertaining to what occurred following the threat on Spillar's life.

The trial court stated that it was "going to strike the testimony \*\*\* as to what was going to happen to Mr. Spillar or not happen to Mr. Spillar" and did not restrict its instructions to the jury as to what occurred following the threat on Spillar's life. We believe the prompt action by the trial court cured any prejudice that may have occurred. (*People v. Harris* (1989), 132 Ill. 2d 366, 386.) We also conclude that introduction of the attack on the guard assigned to the south cellhouse the day before Taylor was murdered was cumulative to properly admitted evidence that the BGD held the administration accountable for Jones' death. A request to instruct the jury to consider the other-crimes evidence simply as additional evidence in support of the State's motive theory would have been proper, but the burden to request such an instruction rested with defendant. As he did not request such an instruction at trial, we decline to consider his argument on the matter now.

Defendant next argues that, assuming defendant's status as a member of the BGD and the circumstances surrounding Jones' death were relevant to demonstrate a motive for Taylor's murder, evidence of the details of gang activity which was peripheral to motive was irrelevant and should have been excluded. Defendant argues that the testimonies of Martin and Jarrett were not confined to evidence probative of motive, but extended to irrelevant matters. Defendant argues to this court that allowance of an excessive amount of evidence on an issue which is only peripheral to the offense for which the defendant is being tried demonstrates an insensitivity by the trial court to the need of balancing the probative

value of evidence against its potential prejudice to the defendant. We do not believe the record in this matter supports defendant's arguments or concerns.

At trial, over defense objections, Martin testified about the inception and development of the BGD from the 1960s until the present. He also identified different types of criminal activity the BGD was involved in and testified that a contract would be put out against an individual who testified against a member of the BGD.

In response to defense counsel's objections to Martin's testimony regarding defendant's status as a UFO member, the trial court dismissed the jury and heard arguments from both parties on the relevancy objection. After considering the arguments, the court discussed the reasons for its ruling allowing Martin to continue to testify. The court's comments indicate a sensitivity to the concerns of the prejudicial impact of Martin's testimony. The court analogized the testimony Martin was giving to having a witness say that a defendant is a well-known hit man for the mafia. "Now that fact may be true. Awfully hard to prove. Has undoubtedly a prejudicial effect on the jury." Later in his ruling, the court repeated his concerns about the potential prejudice of the testimony:

> "This is one where I think that unless Mr. Martin is prepared to testify from some direct knowledge as to what he thinks [defendant's] position is [in the BGD], I'm not going to let him testify; that the prejudicial effect in my opinion outweighs the probative value."

In addition, at one point in his testimony, Martin was asked whether a BGD member would testify falsely on behalf of another BGD member if he were asked to. In response to defense counsel's objection, the court admonished the jury that "this is this witnesses' impression of gang code and rules, and not indicating to the jury that it would be done in any specific occasion or whether or not it has any bearing on this case."

Whether evidence is relevant and admissible is within the discretion of the trial court. Its decision will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Hayes* (1990), 139 Ill. 2d 89, 130; *People v. Johnson* (1987), 116 Ill. 2d 13, 24.) Our review of the record leads us to conclude that the trial court did not abuse its discretion in allowing the testimony.

Defendant refers to the opinion in *People v. Cruz* (1987), 164 Ill. App. 3d 802, as support for his position. We find that matter distinguishable from the one before us. In *Cruz*, the trial court allowed portions of a documentary to be used to impeach the defendant's argument that he was not a member of a certain street gang. The defendant appeared in the documentary discussing gang activity with a police officer and the prosecution argued that the film showed that he was an active member of the street gang.

The appellate court reversed, concluding that the film was irrelevant to whether the defendant was a gang member three months after the documentary was filmed, on the date the victim was killed. The appellate court concluded that the film was inadmissible and that the portions that were shown to the jury did not aid in its determination of the defendant's guilt and were inflammatory and prejudicial. *Cruz*, 164 Ill. App. 3d at 811.

In this matter, the testimonies of Martin and Jarret were not offered to impeach defendant, nor was the evidence inadmissible. The relevance of the testimonies was within the province of the trial court and after reviewing the record, we do not believe that it abused its discretion in admitting the evidence.

Defendant also objects to testimony from Martin regarding what, if anything, he received in exchange for his testimony. The record reveals that the defendant elicited this testimony on cross-examination, and as he did

not move to strike it, we do not believe defendant can now complain of the error.

Defendant next argues that the trial court's restriction of his examination of Spillar and Brown regarding their interest, bias or motive to cooperate with the Department in the prosecution of defendant denied him his sixth amendment right of confrontation. Defendant concedes that he has waived review of this issue; however, we shall consider defendant's arguments under the second prong of the the plain error rule, as the complained-of error involves defendant's constitutional right to confront witnesses.

Defendant sought to cross-examine Spillar to show that institutional disciplinary action taken against Spillar provided a motive for Spillar to ingratiate himself with the authorities investigating Taylor's murder. In 1984, Spillar received a certain amount of disciplinary time and some good time taken away for an attack on two guards at Stateville. In 1986 he had 360 days of good time taken away for attempted murder of another inmate. Defendant sought to establish that Spillar's desire to achieve early release through restoration of good time created a motive for him to cooperate with the Department. (Spillar did in fact have good time restored after agreeing to become a witness for the State but the adjustment committee said that his being a witness was not a consideration.)

The following exchange occurred early in defendant's cross-examination of Spillar:

"DEFENDANT: In 1984 did you attack some guard at Stateville by the name of Robert William—

THE PROSECUTOR: Your Honor, I'm going to object to this.

THE COURT: All right. Let's take the jury out."

The State objected to defendant's attempt to impeach the witness with a prior bad act, Spillar's attack on the

guard in 1984. Defendant argued that use of prior bad acts to impeach was permissible "when you are talking about a motive that lies behind his own interests." The State argued that while "alluding to the fact that something has been done with good time" is permissible, "to ask a witness about a prior bad act *** , it's not permitted under the law."

In its ruling on the objection the court stated the following:

> "The Court's ruling is that no inquiry may be made of persons who have knowledge or testimony as to this particular murder based on anything other than raising prior convictions. I think the rules of evidence are clear that it's only prior convictions, and not bad acts, which can be usable to impeach because what we are doing is we are suggesting that the jury consider, which it has a right to do, someone's prior convictions for criminal acts, how that may bear on their credibility or believeability, but the law in Illinois is very clear we are talking about prior convictions. ***
>
> You can't use arrests. It's convictions only that we can talk about *** ."

The sixth amendment right of confrontation includes the right to cross-examine a witness regarding any fact which would reasonably tend to show that the testimony of the witness might be influenced by bias, interest, or motive. (*People v. Triplett* (1985), 108 Ill. 2d 463, 474.) A witness may be impeached by attacking his character, but only convictions may be proved for this purpose; proof of arrests, indictments, charges or actual commission of crime are not admissible. (*Triplett*, 108 Ill. 2d at 475.) Attempting to demonstrate a witness' bias, interest, or motive to testify is also an acceptable method of impeachment. "With this method of impeachment, 'the fact that a witness has been arrested or charged with a crime may be shown or inquired into where it would reasonably tend to show that his testimony might be influ-

enced by interest, bias or a motive to testify falsely.' " (Emphasis omitted.) *Triplett,* 108 Ill. 2d at 475, quoting *People v. Mason* (1963), 28 Ill. 2d 396, 401.

As noted above, defendant sought to establish that Spillar's desire to achieve early release through restoration of good time created a motive for him to cooperate with the Department. In other words, defendant attempted to demonstrate that Spillar anticipated leniency in exchange for testifying. The trial court was incorrect when it stated that only prior convictions could be used to impeach; proof of bad acts is inadmissible to impeach character, but is admissible when introduced to show bias, interest or motive. Based apparently on this understanding of the law, the trial court did not allow defendant to engage in certain lines of questioning.

Although the trial court's understanding of what is properly admissible as evidence for impeachment was incomplete, we believe that the evidence defendant sought to introduce to show bias, interest or motive was too speculative. Whereas defendant attempted to show that Spillar hoped for favorable treatment from the adjustment committee that his institutional record did not merit, the record in this matter shows that the adjustment committee did not consider whether an inmate was a prosecution witness in considering parole. Moreover, the record shows that Spillar served his entire sentence and was released at the time of his testimony. Therefore, we hold that defendant was not denied his sixth amendment right when the trial court precluded him from cross-examining Spillar with regard to his prior assaults on the prison guards.

Defendant next argues that the trial court's admonishment of defendant that the jurors might feel that he was trying to hide something if he did not testify, notwithstanding an instruction to the contrary, violated his

fifth amendment right against self-incrimination. We disagree.

Outside the presence of the jury and immediately prior to the defense resting, the trial court discussed with defendant his choice to not testify. Defendant stated to his attorney and to the court that he chose not to testify, at which point the court cautioned defendant that whether or not he testified, "there are risks either way":

> "Okay, now I'm not going to kid you, and you're not going to kid me. We can tell jurors that they cannot consider your failure to testify, and I think in selecting these people they truly understand that and are committed to that, that they can't help the state if you don't. But we also know human nature, and you've had some jurors while you were present in the courtroom who said they might wonder about it, that they might feel you were trying to hide something. I think those people have been excused. I don't think any of those people are on the jury. But you understand, there are risks either way, am I correct?"

Defendant argues that the court exceeded the scope of its authority with these statements.

Defendant refers to the opinion in *State v. Gunter* (1985), 286 S.C. 556, 335 S.E.2d 542, in support of his position. In *Gunter*, the trial court warned the defendant that "[i]f you do not testify, you know that that jury is going to hold it against you." Further, the court cautioned the defendant that although the jurors would be instructed "not to hold [the defendant's decision not to testify] against [him], *** they're likely to do it anyhow." The defendant argued that the trial court's statements amounted to official coercion and induced him to testify in violation of the fifth amendment. The supreme court of South Carolina agreed and reversed and remanded for a new trial.

The present case is distinguishable. Defendant voluntarily chose not to testify and did not deviate from that decision after listening to the trial court's statements. We do not find the trial court's statements to have exceeded the court's authority to establish that a defendant's decision to testify or not testify is based on an accurate understanding of his rights under the fifth amendment. The trial court here did not express its opinion but, rather, sought to make clear to defendant that there were risks attendant to either decision he made. Therefore, we do not find that the trial court exceeded its authority to instruct defendant as to his fifth amendment rights.

Defendant next argues that the trial court's failure to instruct the jury on the elements of the offense and the State's burden of proof denied defendant his sixth amendment and fourteenth amendment right to a fair trial and impartial jury trial.

Defendant has waived review of this matter by failing to object to the instructions at the time they were given and by failing to raise the issue in his post-trial motion. (*People v. Easley*, 148 Ill. 2d at 337; *People v. Huckstead* (1982), 91 Ill. 2d 536, 543.) However, we shall consider the error pursuant to our authority under this court's Rule 451(c) (134 Ill. 2d R. 451(c)).

This court considered the identical issue in *Easley*, 148 Ill. 2d at 336-39. In that matter, the murder instructions differed from the Illinois Pattern Jury Instructions, Criminal 2d, for voluntary murder in the same manner as do the instructions here. This court concluded that although the instructions given to the jury misstated the burden of proof with regard to a finding of not guilty, the error was harmless. *Easley*, 148 Ill. 2d at 339-40.

Defendant next argues that the prosecutor's explanation of the death penalty instructions in closing argument restricted the jury's consideration of the mitigating

evidence in violation of the eighth and fourteenth amendments. Defendant concedes he failed to preserve this issue for purposes of review, but asks this court to consider it as plain error. We decline to do so, as we conclude that the plain error rule is inapplicable for review of this issue.

Defendant next argues that he was denied effective assistance of counsel at the close of the second stage of the sentencing hearing. Defendant argues that the closing argument delivered by counsel was professionally unreasonable where counsel "asked the jurors to violate their oaths and refuse to follow their instructions" and sentence defendant to a term in prison rather than death.

Contrary to defendant's argument, our review of counsel's statements at closing do not support defendant's position. In fact, the record reveals that counsel argued to the contrary where he asked the jurors to keep an open mind when they began their deliberations: "And I hope that pursuant to the instructions given to you by the Judge that you haven't made up your mind yet, because if you've made up your mind you'll be violating that oath of faithful performance of your duties."

Admittedly, counsel stressed in his closing statements defendant's humanity: "[Defendant's] a human being. He's a convict, convicted felon, bad person, but he's a human being. If there's one redeeming factor it's he's a human being. Anybody that is a human being has a possibility for rehabilitation." His focus, however intense it may have been, was not to the exclusion of reference to the fact that mitigating factors existed sufficient to preclude the imposition of the death penalty. ("Are there any mitigating factors that you have heard from this witness stand, or that you've heard during the course of this trial, that suggest to you that the death penalty

should not be given? I will say to you there are mitigating factors ***.")

Defendant refers to this court's opinion in *People v. Chandler* (1989), 129 Ill. 2d 233, as support for his argument. That matter is distinguishable from the one presently before us. In *Chandler*, the defendant's counsel abandoned his client's only defense in the hope that the jury's sympathy would cause it to misapply or ignore the law it had sworn to follow. This court found the defendant's counsel ineffective, as his trial strategy amounted to no real defense at all.

In this matter, defendant's counsel did not concede, as defendant argues in his brief, that the death penalty was an appropriate penalty for Lucas. Therefore we reject defendant's arguments on this issue.

Defendant's next argument focuses on the testimonies of Spillar and Demetre Brown. Defendant argues that the credibility of these witnesses was unfairly enhanced by evidence that they had made statements to the Department on the date of Taylor's murder which were consistent with their testimonies at trial. Defendant concedes that he has waived this issue for purposes of review on appeal, and as we have held that plain error is not applicable, we decline to consider defendant's argument on this point.

Defendant next argues that he was denied due process when the prosecutor insinuated, without proof, that one defense witness misrepresented the extent of his criminal background, and another had made a prior inconsistent statement, and impeached a defense witness with proof of a prior statement which introduced a collateral matter and was not materially inconsistent with his trial testimony, without laying the foundation for his impeachment.

Again, defendant concedes that he has failed to preserve these issues for review on appeal. We decline to

consider them, as we hold that the plain error rule is inapplicable.

Likewise, defendant concedes he has waived his next two issues, that he was denied a fair jury trial and a fair jury sentencing by the admission of inflammatory evidence of Taylor's character and that he left a wife and family, and that testimony at the penalty hearing from the son of the man defendant murdered was inflammatory and denied him a fair jury sentencing. Defendant asks this court to consider the complained-of errors under the plain error rule, which we decline to do, in light of our earlier analysis in this area.

As his final argument for vacating his death sentence, defendant challenges the constitutionality of the Illinois death penalty statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). Defendant proffers two grounds for invalidating the statute: (1) the statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences, and (2) the statute violates the eighth and fourteenth amendments because it places a burden on the defendant which precludes meaningful consideration of mitigating evidence.

As to the first of these challenges, this argument has been repeatedly considered and rejected by this court and we decline to reconsider this court's previous holdings. (See *People v. Johnson* (1991), 146 Ill. 2d 109; *People v. Whitehead* (1987), 116 Ill. 2d 425.) Likewise, this court recently considered and rejected the second of defendant's challenges. (*People v. Hampton* (1992), 149 Ill. 2d 71, 116-17.) Because defendant does not offer any additional reasons for this court to reconsider its decision on this matter, we reject defendant's second challenge to the death penalty statute.

For the reasons sets forth above, we affirm defendant's conviction and death sentence. We direct the clerk

of this court to enter an order setting Tuesday, January 12, 1993, as the date on which the sentence of death ordered by the circuit court of Madison County shall be carried out in the manner provided by law. (Ill. Rev. Stat. 1987, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Affirmed.*