THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR CRUZ, Defendant-Appellant.

First District (5th Division)   No. 84—2468

Opinion filed December 11, 1987.—Rehearing denied January 26, 1988.

Paul P. Biebel, Public Defender, of Chicago (Margaret M. Drewko, Gregory W. O'Reilly and Robert P. Isaacson, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Karyn Stratton, and Peter D. Zaper, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Victor Cruz, was found guilty of the attempted murder of Javier Garcia on January 14, 1982. Cruz was sentenced to 22 years' imprisonment. On appeal Cruz contends that the trial court erred and that he was denied a fair trial because the State was erroneously permitted to present to the jury a highly inflammatory, prejudicial and inadmissible documentary video film, entitled "Street Wars," in an unsuccessful attempt to impeach his testimony on a purely collateral and irrelevant matter. We reverse and remand for a new trial. The pertinent evidence and procedure at trial follow.

During the course of the trial, the trial judge conducted a hearing, out of the jury's presence, to determine the admissibility of evidence which would indicate that the shooting of Garcia was related to street gang activities. The defendant's attorney moved to exclude any evidence which would suggest to the jury that defendant was a member of the Ambros street gang at the time Garcia was shot and to exclude evidence that defendant was motivated by such street gang membership to shoot Garcia.

The prosecutor stated that Garcia would testify that he had been harassed by members of the Ambros street gang to become one of their members and that the shooting was an Ambros gang attempt to recruit Garcia. The prosecutor admitted that the State had no evidence, nor even any knowledge, that any member of the Ambros street gang had harassed Garcia. The prosecutor stated, however, that if the defendant testified that he was not a member of the Ambros street gang at the time Garcia was shot, then the State would present contradictory evidence, which would also establish gang activity as the motive for the shooting of Garcia and which would reinforce Garcia's identification of defendant as the person who shot him. The prosecutor made no mention at this time that the contradictory evidence to which he referred was the documentary videotape gang film.

The trial judge read a police report furnished by the prosecutor in which Garcia stated to the police that he had been recently harassed by Ambros members and that defendant was a member of the Ambros. The trial judge stated, "I would allow it to go in. From reading this police report it is quite evident that this is a gang related case." The trial judge also ruled that if Garcia belonged to a rival gang of

the Ambros', then such evidence was also relevant and admissible to show Garcia's bias and motive to testify falsely against the defendant. These comments by the trial court appear to be the initiation of the prosecutor's vacillation on the motive for Garcia's shooting from (1) an attempt to recruit Garcia into the Ambros street gang to (2) revenge by the Ambros street gang against Garcia because he was a member of the Ambros' rival street gang, the Bishops, who were believed to have shot a member of the Ambros previously.

Garcia testified before the jury on direct examination that on January 14, 1982, at approximately 7:45 a.m., he left his parents' house and walked toward Benito Juarez High School. Garcia stated that when he was about 1½ blocks from the school he saw Cruz walking towards him. Garcia stated that Cruz called out Garcia's name, and Garcia turned around. Cruz pulled out a gun and shot Garcia in the mouth. Garcia testified that Cruz ran in one direction and he ran in the opposite direction toward the school. When he reached Juarez High School he ran to the principal's office and the police were summoned.

Garcia further testified on direct examination that Cruz was a leader of the Ambros street gang. Garcia testified that he belonged to the Bishops street gang from June 1981 to September 1981, when he quit because the Bishops began to engage in "heavy fighting." He stated that the Ambros street gang was the Bishops street gang's rival, but that when he was shot he was no longer a member of the Bishops street gang.

On cross-examination Garcia testified that prior to the shooting he and defendant had never had an argument, that they passed each other on the street and that Garcia never paid defendant any attention. Garcia testified that on the day he was shot he had no ill feelings towards defendant, that there was no grudge between them, that defendant had no reason to shoot him and that he did not know why he had been shot.

Cruz testified in his own behalf. He stated that he had seen Garcia in the neighborhood and there were no ill feelings between them. Cruz testified further that he was not near Juarez High School on January 14, 1982, and that he was not the person who shot Garcia on that date.

On cross-examination Cruz stated that he joined the Ambros street gang in 1976, quit the Ambros in 1978 and did not join another gang. Thereupon, the prosecutor moved to admit into evidence and present to the jury a documentary film "Street Wars," made in September or October of 1981, at least three or four months before Gar-

cia was shot. A Chicago television crew made the documentary film on street gangs for public television and in the film, *inter alia*, the defendant discussed gang activity with Chicago police officer Erasmo Rodriguez. The prosecutor offered the film to prove that Cruz was an active Ambros gang member at the time the film was made, which was irrelevant to whether Cruz was a member of a gang three months later when Garcia was shot. Cruz admitted talking to the film crew, but denied both that he was a member of the Ambros street gang at that time and he also denied that he told the film crew that he was a gang member at that time.

We note that the defendant's direct testimony was that previous to January 1982, in his younger life, he was a member of the Ambros street gang. We further note that the prosecutor established on cross-examination of the defendant that he quit the Ambros street gang in 1978. The prosecutor concedes that the documentary street gang film was made in September or October 1981. Garcia was shot on January 14, 1982. Thus, the prosecutor did not contend and could not have contended that the film was offered to or would establish that the defendant belonged to the Ambros street gang on the date that Garcia was shot.

The trial court conducted a hearing out of the jury's presence to determine the admissibility of the film. The film was viewed by the court and counsel, also out of the presence of the jury. Thereafter, defense counsel stated his additional objections to the film's admissibility as follows:

"Your Honor, I would have objections to it being played. There are other individuals in the tape. There are other people saying things at the same exact time. There is [*sic*] times in the tape when the camera moves away from Victor Cruz and people are talking and you don't know who is saying what. There are three or four people talking at the same time.

I think the whole tape is highly prejudicial, and its prejudicial effect on this jury far outweighs any probative value. \*\*\*

I think showing the defendant is highly prejudicial to this jury. It takes away from the issue of who was the shooter. It introduces other individuals into the case that are on the tape, and we don't know \*\*\* who is saying what on that tape and a lot of things are said in relation to other cases about somebody else being shot or stabbed and it has nothing to do with this case, Your Honor."

The trial court ruled:

"I propose that the Assistant State's Attorney sit by the

camera or by the TV set and when I say cut, whoever it is, whether it is you, Ms. Trafelet or you, Mr. Adair, you cut it. I'll allow the first portion in where the defendant is one of those speaking and the last portion, again where the defendant is speaking. I don't want the close-ups of the injuries of the one guy that said he was shot with a 30.06.

\* \* \*

Before the jury starts to see it the camera will be turned away from the jury and it's only until we get to the exact spot that we'll then turn it to the jury. We'll have the sound system really low and it will be turned away from the jury."

Thereupon, portions of the film were shown to the jury. Thereafter the following colloquy occurred:

"[DEFENSE ATTORNEY]: With reference to the playing of the tape, it was my understanding that only one portion of the tape was going to be played and it appears more than that portion was played.

\* \* \*

It sounded to me, and I heard the beginning, the title was played again and it went into the words gang wars, the introduction. My objection was to that being played and I thought your Honor had sustained the objection and said only the portion of the conversations that the boys were having out on the street were going to be played.

And then in the second part that was played was turned on prematurely, also because Officer Calabrese came on talking about people using guns and having guns and using them.

\* \* \*

Based on extra portions of the tape coming in I think again it is highly prejudicial, and I think based on the jury hearing that, especially the portion with Officer Calabrese talking about these gang members using guns, I think that inference is now in the record that he is talking about this particular group, about this particular defendant using guns.

I think that inference is highly prejudicial and at this point in time I would move for a mistrial based on that portion of the tape, Officer Calabrese coming in talking about these people using guns, these gang members using guns. The inference is Victor Cruz is one of the gang members he's referring to."

The trial court did not address or rule on the substance or the merits of the defense counsel's motion for a mistrial, *i.e.*, that the jury had been shown inflammatory and prejudicial scenes of the film

which the trial court had intended and ruled that the jury should and would not see. Instead, the trial court simply ruled:

"It's just about impossible to get this started and stopped exactly where we would like it to. I think we did a pretty good job of it, and your objection and your motion is overruled."

During oral argument of this appeal counsel were unable to designate to this court that portion of the film which was shown to the jury. We granted the State's motion to remand the cause to the trial court to conduct a hearing to determine which portions of the film were actually shown to the jury.

On remand, the film was viewed by the trial judge and trial counsel, who stipulated that the jury saw from the beginning of the film to that portion where a man stated that he had been shot with a 30.06 calibre rifle. The trial judge had ruled at trial that this portion of the film should not be shown to the jury.

It was further stipulated at this trial hearing pending appeal that the first remarks heard on the film by the jury were:

"War between rival street gangs of [*sic*] torture and revenge adds up to an escalating body count of gang members and people who get caught up in their crossfire. This special edition of *Checking It Out* investigate the crisis of gang warfare in the south side of Chicago."

At this hearing in the trial court pending appeal, the trial prosecutor was called by the State as a witness. The trial prosecutor was not asked and did not testify, however, as to what scenes of the film were shown to the jury during the trial.

The defense trial attorney was called by the defendant as a witness on the hearing. He testified:

"When the tape came on I heard a siren and I also started hearing conversation in the tape because I had seen the tape previously before it being shown to the jury, we all did, and I heard things that I, it was my understanding it was agreed the jury was not going to hear. *** Officer Calabrese was talking about guns and people using them and how they use them and the gangs use them ***. I made an objection and asked for a side bar, if I recall and we put in the record what I believe I had heard and *** made objections and I know distinctly that I heard Officer Calabrese voice and that the jury heard Officer Calabrese voice also talking about guns and people using guns.
* * *

Q. When you had made a motion for a mistrial after the tape was viewed to the jury, did you in fact bring to Judge

Heyda's attention that the jury had heard portions of Officer Calabrese's taped voice talking about guns?

A. Yes, I did and I indicated what I believed I had heard, when I was sitting there when I heard those sirens I knew that the tape had started prematurely and *** I recall I heard Officer Calabrese's voice and I had heard him talking about guns and I, I am not sure I saw his face, I can't say I did on the screen, I know by that time had seen prematurely something that was not supposed to be played and I made my record as to what I had heard played, particularly up to the point Officer Calabrese's voice played, it was all prior to what was my understanding was supposed to be shown to the jury.

*  *  *

Q. Mr. DeLeon, did you also bring to the attention of the Judge that the title, star—rather, gang wars was heard again by the jury was played a second time to the jury and that the introduction was played the jury?

A. That was my recollection because my recollection of the tape was that when the sirens were blaring, when I had previously viewed it and I had seen the person being wheeled away with blood and everything on the cart, *** the siren went off, *** the jury saw from the point and time the siren went off all the way up to where Mr. Calabrese was talking about guns and I believe they, part of that was the title."

During closing argument on the remand hearing the defendant's appellate attorney argued to the trial court:

"I have no doubt that your Honor took precaution to make sure that the jury did not hear that inflammatory part of the tape ***. *** [T]he issue here is whether or not the jury inadvertently heard or saw part of it and if so how much."

More significantly, during the defendant's appellate attorney's argument he further pointed out to the trial court:

"I would like also to point out when Mr. DeLeon [the defendant's trial attorney] testified before your Honor this morning *** he heard sirens, he heard Officer Calabrese talking about guns, that although the State had both of these State's Attorneys here in court prepared to testify, they did not call either of those two as rebuttal witnesses to rebut Mr. DeLeon's testimony, that he heard it and that he came around and saw it so that really stands uncontradicted and that doesn't involve credibility of witnesses at all. *** [V]ery shortly after the tape was played to the jury, Mr. DeLeon's defense attorney in this case

made a motion for mistrial and one of the premises or one of the grounds of his motion was that the jury did hear a portion of Officer Calabrese's taped conversation, taped voices talking about guns and he was specific to put that into his motion for a mistrial.

* * *

So for those reasons and we will be submitting *** a proposed finding of facts which I will now submit to your Honor to clarify what we have.

Point two is not in dispute; the first portion of the tape showed Victor Cruz and other young men being searched by the police while the voice of a commentator could be, could be heard describing the gang activity. The first paragraph is not in dispute, that two portions of the video tape entitled, 'Street Wars' were admitted into evidence and were viewed by the jury. And the sixth part of the tape is not in dispute, Your Honor has just recently commented and that is Victor Cruz and other young men were then seen and heard talking and that was the second portion of the tape that was viewed; so, the only real portions that were in dispute or that are presently in dispute, are exactly how much, if any part of officer Calabrese talking was seen and heard by the jury, and whether the jury saw the title, 'Street Wars' a second time, this is paragraph three, while in the background a trauma victim on a stretcher was seen being wheeled into a hospital emergency room. And as Your Honor will recall, attorney DeLeon was very specific that that was heard because he could hear it himself in open court. I have nothing further, Judge."

In his responding closing argument on the remand hearing the prosecutor did not dispute defense attorney DeLeon's testimony of what portion of the film the jury was shown. Nor did the prosecutor deny or contest the defendant's appellate attorney's recapitulation, during his closing argument on the motion, of what portion of the film the jury viewed. The prosecutor simply argued that he "did not know who has the burden here" on the remand hearing.

After the arguments of counsel, the trial court concluded:

"Well, these proposed findings of fact would require me to go ahead and review this tape again and include what they seen [sic] and what they didn't see and I would expect that you people would just go ahead and show the Appellate Court what is agreed upon."

The prosecutor asked the trial court not to sign the defendant's

appellate attorney's proposed findings of fact of what portion of the film was shown the jury. The trial court responded:

"Well, you people have already stipulated to the first portion so there is absolutely no problem with that."

The defense attorney replied:

"Right, and the second portion, the part that occurs after Officer Calabrese is talking, finishes talking; so, we have no problem with that, that is correct, ***."

The trial court then stated:

"I think the record reflects that what portion that they did see just before these gang members came on was by accident and what we were trying to zero in on was just the conversation of these gentlemen for the impeachment value."

The defense attorney thereupon requested that his proposed findings of fact be made a part of the record:

"Although your Honor did not sign it *** I should do that so the record is clear what I submitted to your Honor, I will submit the unsigned proposed findings of fact to the appellate court, because that's our position of what exactly was seen by the jury."

The prosecutor stated that he had no objection to the proposed findings of fact being made a part of the record on appeal.

The proposed findings of fact follow:

"1. Two portions of the video-tape entitled 'Street Wars' were admitted into evidence and viewed by the jury.

2. The first portion of the tape showed Victor Cruz and other young men being searched by the police while the voice of a commentator could be heard describing street-gang activity.

3. The first portion of the tape showed the title 'Street Wars' while in the background a trauma victim on a stretcher was seen being wheeled into a hospital emergency room.

4. The second portion of the video-tape began with a shot of Officer Calabrese on the screen describing the guns which street-gang members use.

5. The visual shot of Officer Calabrese then changed to a visual shot of Victor Cruz and other young men being searched by the police while the voice of officer Calabrese could be heard describing the guns which street-gang members use.

6. Victor Cruz and other young men were seen and heard talking."

It is apparent from the original trial court record that the trial

court experienced difficulty in confining the jury's exposure to that portion of the film that the trial court had designated the jury would be permitted to see. It is also apparent from the original trial court record that the jury saw portions of the film that the trial court had ruled the jury was not to see. Likewise, from the original trial court record it is difficult to determine what portion of the film the jury saw.

From the supplemental record on appeal of the trial court hearing, conducted pursuant to our remandment order to determine what portions of the film the jury saw, it continues to be difficult to discern what portions of the film the jury saw. We note, however, that on the remand hearing it was stipulated that the jury saw from the beginning of the film to the scene in which a man stated that he had been shot with a 30.06 calibre rifle. We further note that the trial judge had ruled that this portion of the film was not to be seen by the jury.

We additionally observe that it was also stipulated at the remand hearing that the first remarks heard on film by the jury were:

> "War between rival street gangs [*sic*] of torture and revenge adds up to an escalating body count of gang members and people who get caught up in their crossfire. This special edition of *Checking It Out* investigates the crisis of gang warfare in the south side of Chicago."

We also note Mr. DeLeon's, the defendant's trial attorney's, uncontradicted testimony at the remand hearing of the portions of the film which were shown to the jury.

We have viewed the film in its entirety and conclude that those portions which the jury saw were highly inflammatory and prejudicial and did not properly aid the jury in determining the relatively simple controversy before it—whether the evidence established beyond a reasonable doubt that the defendant, Victor Cruz, shot the victim, Javier Garcia. It was the State's theory on the one hand that the defendant was a member of the Ambros street gang and that he shot Garcia, a member of the rival Bishops street gang because of animosity between the two rivaling gangs. It was the State's theory, on the other hand, that the defendant shot Garcia to recruit Garcia into the Ambros gang. Both the defendant and Garcia admitted their prior membership in their respective street gangs. Each contended, however, that at the time Garcia was shot he had terminated his membership in his gang.

The prosecutor inferentially contended that the scenes in the film that he proposed presenting to the jury were admissible to rebut the defendant's direct testimony that he was not a member of the Am-

bros street gang when Garcia was shot. The film did not do so and could not have done so simply because the film was made in September or October 1981, at least three months before Garcia was shot.

The realistic purpose the film served was to improperly inflame and distract the jury from its function; to arouse their passions against street gang activity—crimes—shootings—violence—*murder*— and the defendant; to motivate the jury's hostility against the defendant; and to induce the jury to find the defendant guilty. This film was of no valid assistance to the jury in the performance of their duty to weigh and evaluate the proper evidence before it and in reaching an accurate determination of the defendant's guilt or innocence.

The jury was permitted to hear and see in the film descriptions of gang murders and other violence by gangs and highly emotional, heartrending statements of gang victims, their families and members of the community. The scenes were violent. Close-up shots of a hideous scar on a young man's neck, blood and gunshot wounds were shown. A mother was shown lamenting the death of her son by street gang violence. All the street gang members shown in the film and the film narrator, who often spoke in Spanish, were Hispanics, as was the defendant, although street gangs are by no means confined to this ethnic group.

Nothing is more obvious from the trial record than that the prosecutor sought by the film to impart substantive character to defendant's role in street gangs, a tactic that has been condemned by the supreme court. (*People v. Bailey* (1975), 60 Ill. 2d 37, 43, 322 N.E.2d 804; *People v. Collins* (1971), 49 Ill. 2d 179, 274 N.E.2d 77.) The prosecutor and defense attorney were aware that in Chicago, as in every other large metropolitan area, "there is a deep, bitter and widespread prejudice against street gangs." See *People v. Parrot* (1976), 40 Ill. App. 3d 328, 331, 352 N.E.2d 299.

When evidence raises a collateral issue and tends to confuse the jury in reaching a proper verdict on the merits of the case, then that evidence should be excluded. (*People v. Triplett* (1965), 66 Ill. App. 2d 237, 242, 213 N.E.2d 290.) The purpose of impeachment is to adversely affect the witness' credibility, not to prove the facts asserted in the impeaching evidence. (*People v. Bailey* (1975), 60 Ill. 2d 37, 43, 322 N.E.2d 804; *People v. Kimbrough* (1970), 131 Ill. App. 2d 36, 44, 266 N.E.2d 431.) Defendant's statements in the film were not admissions by the defendant that he was member of the Ambros street gang at the time the film was made or when Garcia was thereafter shot, although the defendant's statements and other scenes and statements in the film clearly established the defendant's gang mem-

bership and activities prior thereto. The defendant admitted his prior membership in the Ambros street gang and his prior membership in the Ambros street gang was not an issue at trial. Thus, evidence to prove that the defendant was a gang member months before Garcia was shot was immaterial to the issue before the jury; namely, whether he was a gang member at that time and attempted to murder Garcia. (See *People v. Holmes* (1976), 41 Ill. App. 3d 956, 354 N.E.2d 261; *People v. Triplett* (1965), 66 Ill. App. 2d 237, 213 N.E.2d 290.) The film was inadmissible.

In closing argument to the jury the prosecutor was unable to conceal the true motive for having the jury view the film. In his closing argument he attempted to persuade the jury to accept and rely upon this impeachment-labeled evidence as substantive evidence to establish the defendant's gang membership and gang activity, and to establish the prosecutor's inconsistent theories of the motive for the shooting as well. The prosecutor argued:

"Let's talk about the tape, the tape you saw. What's significant about the tape is this: Victor Cruz did not know we had that tape until after he gave his testimony on direct examination. He was not prepared for it. Unlike the last year or two when he probably talked with his attorney and talked with his friends and talked to those girls and any other people he has wanted to and had the opportunity to come up with his defense and get it all together, that is one he was not prepared for.

So without knowing we had the tape he tells you he terminated his membership in the Ambrose street gang in 1978. But what does that tape show? You think he is playacting in that tape? You think he's making that up? You think he's going to make statements he's a gang member just for the heck of it so he might get to Hollywood some day? He was bragging out in the street. He was willing to do it.

\* \* \*

Sure, there's a motive in this case. Gang harassment is the motive in this case. Javier Garcia was at one time a member of the gang called the Bishops. He quit that gang. He went back to Juarez High School, out of the gangs. The defendant was a member of the Ambrose street gang. He was not going to school. He was not working. He was a member of a gang. How do these gangs operate? If someone shoots a member of the Ambrose then a member of the Ambrose gets back at a member of the Bishops. That is how it goes.

\* \* \*

The motive is either to get even with a Bishop or it is to recruit another person by forcing him to join your gang. It could be either one of those. But the point is there is a motive here. There is a score to settle. There is a recruitment to be done.

\* \* \*

When the defendant takes the stand to testify he lies about being in a gang, but you saw on TV on the tape that we showed you he was. He was in a gang.

\* \* \*

The tape makes it all clear. It shows you how he is lying, \*\*\* and it is true he did the shooting in this case. That tape shows it because on the one chance he did not know what was coming he lied about his gang membership and we got the best evidence we could. We showed you on tape Victor Cruz is a gang member."

■ The prosecutor at no time asked the defendant if he was a gang member in January 1982, when Garcia was shot, but only if he was a gang member in September or October of 1981 when the film was made, and the film does not show or establish that the defendant was a member of a gang when Garcia was shot. The film was therefore inadmissible. We cannot determine the effect the improper film evidence and the prejudicial arguments had on the jury or speculate that the jury only acted on competent evidence. (*People v. Monroe* (1975), 32 Ill. App. 3d 482, 490, 335 N.E.2d 783.) Although the evidence was sufficient to sustain a guilty finding in the absence of the film evidence, it cannot be rationally contended that the film did not contribute to the defendant's conviction and the error therefore cannot be considered harmless. *People v. Robinson* (1977), 46 Ill. App. 3d 713, 718, 361 N.E.2d 131; *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

Reversed and remanded.

LORENZ and MURRAY, JJ., concur.