SIXTH DIVISION  

OCTOBER 30, 1998

Nos. 1-97-2421 and 1-97-2534 (Consolidated)

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE

) CIRCUIT COURT

Plaintiff-Appellee, ) OF COOK COUNTY.

)

v. ) No. 96 CR 01286

)

LAWON DAVENPORT and IMARI CLEMONS, ) HONORABLE

) JOHN E. MORRISSEY,

Defendants-Appellants. ) JUDGE PRESID­ING.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following simultaneous trials before separate juries in the circuit court of Cook County, defendants Lawon Davenport and Imari Clemons were found guilty of first degree murder.  Daven­

port was sentenced to 28 years in prison; Clemons received a 59 year sen­tence.  Both defendants appeal their convictions.  Clemons also appeals his sentence.

The record indicates that the following facts were adduced at both trials.  Antwan Palton testified that at approximately 5 p.m. on October 6, 1994, he and his brother Columbus were coming home from high school when they exited a bus at the corner of 51st and Peoria Streets in Chicago.  As Antwan and Columbus walked to their home on West 50th Street, Antwan noticed a man at the corner of 50th and Peoria who was dressed in black, with a black cap bearing the words "I'm Real" cocked to the right.  Antwan stated that cocking a hat to the right signified member­

ship in the Gangster Disciples street gang.  Antwan identified this man in court as Clemons.

Antwan testified that Clemons approached him and Columbus.  When Clemons was approximately 10 feet away from the Paltons, Columbus said, "GD."  Clemons pulled a gun from his waistband.  When Clemons was approximately 2 feet away from the Paltons, Clemons responded, "I ain't a GD.  Never could I be a GD."

Antwan testified that Clemons then shot Columbus, who fell backwards.  Antwan and Clemons stood and looked at each other for a few seconds.  Clemons ran from the scene.  Antwan ran home to tell his parents that Columbus had been killed.  Antwan's parents called the police.  Antwan spoke to uniformed police officers that day and to detectives the next day.

Jerome Weathers and Lamont Wesley both testified that they were on West 50th Place on October 6, 1994, and saw the Paltons and Clemons walking down the street seconds before the shooting.  Both also testified that wearing a hat cocked to the right signi­

fied membership in the Gangster Disciples.  Weathers was a member of the Gangster Disciples, but Clemons was a stranger to him at the time.  Wesley is a cousin of Weathers.  Neither Weathers nor Wesley testified to seeing the shooting.  Both Weathers and Wesley identi­fied Clemons in court.

Weathers was convicted in February 1996 of delivery of a controlled substance and sentenced to 18 months of probation.  However, at the time of his testimony, Weathers was in custody on another charge of delivery of a controlled substance and viola­

tion of probation.  Wesley had been convicted in May 1992 of possession of a controlled substance and received probation.  Wesley violated his probation in October 1993, when he was picked up on a charge of possession of a controlled substance with intent to deliver, and was sentenced to 3 years in the Illinois Department of Corrections.  In January 1996, Wesley was convicted of delivery of a controlled substance and again received proba­

tion.  At the time of his testi­mony, Wesley was in custody on another drug charge.  Both Weathers and Wesley testified that the State made no promises in return for their testimony.

Chicago Police Officer John Kotarac testified that on Octo­

ber 6, 1996, he received an assignment call at approximately 5 p.m. of a man shot at 5023 South Peoria.  Officer Kotarac arrived at the scene 2 or 3 minutes later and observed a body laying in the middle of the street.  Officer Kotarac noticed a gunshot wound to the left side of the head above the ear.

Officer Kotarac secured the area and interviewed people at the scene, including Antwan and Weathers.  Officer Kotarac them broad­cast a description of the shooter.  According to Officer Kotarac, Columbus was taken to St. Bernard's Hospital by ambu­

lance.  Officer Kotarac later went to the hospital and learned that Columbus had been pronounced dead on arrival.

Chicago Police Officer Albert Pribek, an evidence technician assigned to the shooting, testified that he recovered a spent .380 caliber Winchester cartridge from the scene.  Forensic pathologist Dr. Barry Lifshultz, who performed the autopsy on Colum­bus, recov­ered a bullet from Columbus Palton's skull and determined that death was caused by a close range gunshot wound to the head.  It was stipulated that if firearms expert James Vantilburg were to testify, he would state that the bullet recov­

ered from the skull was .380 caliber.

Chicago Police Detective James Ward testified that he was assigned to the shooting and arrived at the scene after the body had been taken away.  Detective Ward interviewed people on the street.  Detective Ward then began to look for two suspects.  The first suspect was known as Tyrone Matthews or "Doughboy."  The second suspect was known as Eric.  Detective Ward also had a physical description of Eric.

On October 7, 1994, Detective Ward spoke with Antwan.  Detec­tive Ward submitted a stop order with respect to Tyrone Matthews to the Chicago Police Depart­ment, which would notify Detective Ward if Tyrone Matthews was arrested or finger­printed in some other matter.  On October 8 and 12, 1994, Detective Ward generated supplemental reports regarding the two suspects.  Detective Ward also had been in­formed that the suspects could be members of the Blackstone Nation street gang.

On November 13, 1995, Detective Ward was notified Tyrone Matthews, also known as Lawon Davenport, Tywone Davenport or Doughboy, was at the Area 1 police station.  Out of the presence of the Clemons jury, Detective Ward testified that he interviewed Davenport after informing him of his 
Miranda
 rights at approxi­

mately 4:30 p.m.  According to Detective Ward, Davenport stated that he was a member of the Black P-Stone Nation street gang and had been at home prior to the shooting.  Davenport stated that someone named Myron invited him to go for a walk.  When Davenport and Myron reached the corner of 51st and Morgan, Myron showed Davenport an automatic pistol, stated that he was going to shoot a "GD" and needed Davenport to watch his back.  Davenport told Detective Ward that he stood lookout while Myron walked up 50th Place toward Peoria.  Davenport heard a gunshot come from the area of 50th Place and Peoria, then saw Myron running toward him.  Davenport and Myron ran together for a distance, then split up.  Davenport ran home.

Chicago Police Detective Cliff Gehrke testified that he had also interviewed Davenport on November 13, 1995.  Davenport ini­

tially stated that he was only a witness to the shooting, but later gave an account similar to that related by Detective Ward.

Detective Ward and Assistant State's Attorney (ASA) Chiao Lee testified regard­ing a similar written statement Davenport gave after 10 p.m. on November 13, 1995.  However, the written statement added that Davenport was a "soldier" in the Black P-

Stone Nation, which is above the level of "shorties," but below that of "gener­als" in the gang hierarchy.  Davenport also added that Myron is a member of the Black P-Stone Nation, but Davenport did not know his last name or address.  

The written statement described Myron as dressed in black, wearing a hat with "I'm Real" printed on the front.  Davenport stated that the hat was cocked to the right, falsely signifying membership in the Gangster Disciples, which is a rival of the Black P-Stone Nation.  The two gangs were at war during the summer of 1994.  Thus, Myron "would get a lot of glory" for shooting a "GD" and Davenport would get some glory for helping Myron.  Conversely, if Davenport failed to help Myron, he would be "violated," or beaten.  Davenport's statement further added that after the shoot­ing, Myron was running toward Davenport, carrying the pistol, which was smoking.

Detective Gehrke testified before both juries that on Decem­

ber 20, 1995, he brought Clemons into the Area 1 police station.  Detective Gehrke assembled Clemons and four other individuals for a line-up.  Antwan and Weathers viewed the line-up separately; both identified Clemons.

Chicago Police Detective Joseph Stehlik testified that in April 1997, he was told by ASA Bob Berlin that Wesley may have witnessed the shooting.  On April 15, 1997, Detective Joseph Stehlik went to the Cook County Jail to take Wesley out of cus­

tody to view a line-up.  Detective Stehlik testified that when Wesley got out of the "bullpen" where prisoners were held, he said that the man he had seen on the day of the shooting was in the bullpen.  Wesley described the man.  Detective Stehlik looked into the bullpen, where Clemons matched Wesley's description. 

Wesley also testified to seeing Clemons in the Cook County Jail.  Wesley added that he had asked Clemons why he was in jail and that Clemons had told him.  Wesley also testified that Clemons had tattoos showing he was a member of the Blackstones.

Over the objections of both defendants, Chicago Police Officer John Bloore testified as a gang specialist.  Officer Bloore testi­fied that street gangs in Chicago fell into one of two groups, the Folks and the People.  The Folks use a six-point­

ed star as a symbol, which originated with David Barksdale, the first leader of the Black Gangster Disciples.  The People use a five-pointed star as a symbol, which originated with Jeff Fort, the first leader of the Black P-Stone Nation.

 Officer Bloore testified that Folks cock their hats to the right; the Black P-Stones cock their hats to the left.  The colors of the Black P-Stones are black and red.  The Black P-Stones favor Philadelphia Phillies baseball caps because they are red with a "P" logo that can stand for the People.

Officer Bloore testified that 51st Street was the northern boundary between the territories of the Black P-Stones and the Gangster Disciples, who were at war in October 1994.  Officer Bloore described "false flagging" as a tactic where a gang member enters rival territory posing as a member of the rival gang to draw a rival gang member into the open for an ambush.  Cocking a hat in the manner of a rival gang is a method of false flagging.

Officer Bloore explained that the hierarchy of a street gang usually began with a chief, followed by generals, soldiers and shorties.  Officer Bloore stated that gang members may work their way up through the gang structure.  Killing a rival gang member might result in an increase in rank or other reward from the gang, such as being given a "drug spot" so that the member be­

comes part of the oversight of the gang's drug operations, rather than a person selling drugs.  Conversely, a "violation" is a form of punishment, such as a severe beating, meted out by the gang to discipline members for violating gang rules.

Officer Bloore further testified regarding tattoos worn by members of the Black P-Stones, such as the initials "B.P.S.," or a pyramid with an eye in the center surrounded by clouds.  Over Clemons' objection, Officer Bloore identified tattoos on Clemons' right arm and chest while Clemons stood in the well of the court­

room, including: a five-pointed star and the initials "B.P.S." on Clemons' right arm, a pyramid with an aura on Clemons' chest; a stone on Clemons' left arm; the initials "B.S." on one hand; and the phrase "Stone life" on Clemons' stomach.  Officer Bloore opined that all of these tattoos were associated with the Black P-Stones.  Officer Bloore also identified a teardrop tattoo frequently used by gang members on Clemons' face.  On cross-

examination, Officer Bloore testified that he did not know whether Clemons had these tattoos on the date of the shoot­ing.  Officer Bloore never linked Clemons with a nickname.

The State rested its case against both defendants.  Daven­

port rested his case without presenting evidence.

Clemons called Ronald Pluta, an investigator assigned to ASA Bob Berlin, who testified that he interviewed Wesley on April 4, 1997.  Wesley talked about the shooting, but did not mention that the shooter had a teardrop tattoo on his left cheek.

Ronald Robinson, who was 11 years old in October 1994, testi­fied that he witnessed the shooting from a distance of 99 to 102 feet.  Robinson stated that Antwan had stopped to tie his shoe immediately prior to the shooting.  Robinson described the shooter as an African-American male wearing black clothes and a black skull cap.  Robinson did not see the shooter's face.  

After the shooting, Robinson spoke to the police.  Robinson did not remember whether he told the police that Antwan had stopped to tie his shoes.  The police called Robinson in 1995 to view a line-up, but Robinson's mother would not let him go to the police station.  An investigator came to Robinson's house, where Robinson was shown a photograph of 5 people sitting in a room.  Robinson identified someone other than Clemons as the shooter.

Following closing arguments, jury instructions, and jury deliberations, defendants were found guilty of first degree murder.  The trial court denied both defendants' motion for a new trial.  Subsequently, Davenport was sentenced to 28 years in the Illinois Department of Corrections.  Clemons received a 59 year sentence.  Both defendants now appeal.

I

Initially, both defendants argue that the trial court denied them a fair trial by allowing Officer Bloore to testify regarding the history, structure and workings of the two major street gangs.  The determination of this issue involves a three-part analysis: (1) whether Officer Bloore's testimony qualifies as expert opinion; (2) if so, is it relevant; and (3) does the prejudicial effect of that opinion outweigh its probative value.  
People v. Jackson
, 145 Ill. App. 3d 626, 633, 495 N.E.2d 1207, 1214 (1986).  Each of these inquiries will be addressed in turn.

In this case, Clemons does not dispute that Officer Bloore's testimony qualifies as expert.  Davenport's brief states that "no issue is taken on appeal with Bloore's skill training, or experi­

ence,"  but contends that none of the testimony went beyond the knowledge of a layperson.  However, the trial court could reason­

ably conclude that a layperson does not have the same opportunity to observe and learn about the detailed hierarchy and activities of street gangs as did Officer Bloore.  See, 
e.g., Jackson
, 145 Ill. App. 3d at 634, 495 N.E.2d at 1214.

Defendants argue that Officer Bloore's testimony was irrele­

vant and was elicited only to inflame the jury. Although a deep and widespread public prejudice may exist against street gangs, gang-related evidence will not necessarily be excluded if it is relevant and admissible.  
People v. Gonzalez
, 142 Ill. 2d 481, 489, 568 N.E.2d 864, 867 (1991); 
People v. Smith
, 141 Ill. 2d 40, 58, 565 N.E.2d 900, 907 (1990); see 
People v. Hairston
, 46 Ill. 2d 348, 372, 263 N.E.2d 840, 855 (1970).  Relevant evidence is that which has any tendency to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence.  
Gonzalez
, 142 Ill. 2d at 487-88, 568 N.E.2d at 867.  

Gang-related evidence is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act.  
Smith
, 141 Ill. 2d at 58, 565 N.E.2d at 907; 
Hairston
, 46 Ill. 2d at 372, 263 N.E.2d at 854.  Gang-related evidence is also relevant to identification, or to corroborate a defendant's confession.  
Gonzalez
, 142 Ill. 2d at 488, 568 N.E.2d at 867; 
People v. Murray
, 254 Ill. App. 3d 538, 554, 626 N.E.2d 1140, 1151 (1993); 
People v. Suarez
, 238 Ill. App. 3d 110, 122, 606 N.E.2d 1237, 1244 (1991).  However, such evidence must relate to the crime charged.  
Smith
, 141 Ill. 2d at 58, 565 N.E.2d at 907.

Defendants rely heavily on 
People v. Mason
, 274 Ill. App. 3d 715, 653 N.E.2d 1371 (1995).  In 
Mason
, the defendant and the victim were both Gangster Disciples.  The State introduced gang specialist testimony to support its theory of motive, which was that defendant was ordered to kill the victim by a superior member of the gang, who was concerned that the victim would become an informer for the State.

This court concluded that gang crime specialist testimony similar to Officer Bloore's was irrelevant, inflammatory, and excessive.  While the structure of the Gangster Disciples was relevant to the State's theory of motive, testimony regarding gang rivalries, tattoos and drug sales was not relevant.  
Mason
, 274 Ill. App. 3d at 722, 653 N.E.2d at 1375-76.  This court also found error in the State's use of photographs of the defendant showing gang-related tattoos, holding that the State unduly emphasized them by arguing that they showed defendant was proud of his gang member­ship, instead of arguing that the tattoos showed defendant was a member of the gang, which would have been proper.  
Mason
, 274 Ill. App. 3d at 723, 653 N.E.2d at 1376.  This court concluded that defendant was denied a fair trial.

In this case, Clemons concedes that some of Officer Bloore's testimony was relevant to show the motive for the shooting, such as: the rivalry between the two gangs; the boundary between the gangs in the area of the shooting; the tactic of "false flag­

ging;" and that a gang might reward a member who killed a member of a rival gang.  Clemons argues that the remainder of Officer Bloore's testimony was irrelevant, inflammatory and excessive.  For example, Clemons objects to the testimony regarding the background, history and hierarchy of the two gangs.  Clemons also objects to Officer Bloore's reference to the drug operations of these gangs.  Daven­port makes the same arguments.  

The testimony regarding gang hierarchy is relevant and admis­sible to explain an otherwise inexplicable act and to estab­

lish a motive for the shooting, 
i.e.
 -- advancement within the ranks.  The testimony regarding the background, history and criminal activity of the two gangs is far more troublesome, as it is peripheral to the offense at issue.  However, in 
People v. Lucas
, 151 Ill. 2d 461, 603 N.E.2d 460 (1992), Harry Martin, a former member of the Black Gangster Disciples (BGD), testified "about the inception and development of the BGD from the 1960s until the present.  He also identified different types of crimi­

nal activity the BGD was in­volved in ***."  
Lucas
, 151 Ill. 2d at 488, 603 N.E.2d at 472.  Our supreme court affirmed the trial court's decision to admit the testimony over objections that it was irrelevant, peripheral and excessive, stating that defendant must show a "
clear
 abuse of discretion resulting in 
manifest
 prejudice to the defendant."  
Lucas
, 151 Ill. 2d at 489, 603 N.E.2d at 473 (emphases added).

Trial courts should exercise great care in exercising their discretion to admit gang-related testimony.  See 
Lucas
, 151 Ill. 2d at 487-89, 603 N.E.2d at 472-73.  The record in this case shows that the trial court considered the arguments at length and, while initially skeptical about the probative value of some of the testimony, was ultimately persuaded that it was  relevant and admissible.  As this court must follow precedent, we follow 
Lucas
, but the prosecutorial tactics employed in this case "push the envelope."  We urge the State to act with greater caution and restraint in the future.

Clemons objects to testimony regarding the colors and attire of the Blackstones.  However, Clemons concedes that Officer Bloore's testimony was relevant to show the tactic and methods of "false flagging."  Thus, there is no abuse of discretion here.

Clemons objects to the display of his tattoos and Officer Bloore's testimony regarding them, but such testimony is relevant to the issue of whether Clemons was a gang member.  See 
Mason
, 274 Ill. App. 3d at 723, 653 N.E.2d at 1376.  Clemons relies on 
People v. Cruz
, 164 Ill. App. 3d 802, 518 N.E.2d 320 (1987), which held it was error to allow the showing of a film depicting gang violence made in September or October 1981 to impeach a witness on the issue of gang membership, where the charged shoot­

ing occurred in January 1982.  In 
Cruz
, the defendant admitted that prior member­ship in a street gang and his prior membership was not an issue at trial.  
Cruz
, 164 Ill. App. 3d at 813, 518 N.E.2d at 327.  In this case, Clemons did not admit gang member­

ship.  The tattoos did not address unrelated acts of gang vio­

lence and were not used for impeachment.  Thus, there was no abuse of discretion in admitting the testimony against Clemons.  
Lucas
, 151 Ill. 2d at 489, 603 N.E.2d at 473.

Clemons objects to Officer Bloore's testimony regarding  "violation," the punish­ment a gang may inflict on its members for disobeying gang rules.  This testimony was relevant as to Daven­

port, to show motive and corroborate his written statement, but it was not relevant to the guilt of Clemons.  However, an error does not automatically require reversal, but is harmless where the court is satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction.  
People v. Colon
, 162 Ill. 2d 23, 31-32, 642 N.E.2d 118, 121-22 (1994).  As in 
Colon
, other gang-related testimony was properly admitted and other witnesses identified the defendant as the shooter.  Indeed, in this case, unlike 
Colon
, the eyewitness was not a gang member.  Although the State's introduction of this evidence was improper and its introduction of gang-related evidence peripheral to the offense charged is obnoxious, the evidence against Clemons was overwhelm­ing.  The testimony about "violations" did not contrib­

ute to his conviction and does not warrant reversal.

Davenport argues that Officer Bloore's testimony was unnec­

essary and inflamma­tory because it only repeated statements he made to the police.  This argument fails, given that Davenports trial strategy was to attack his prior statement.  Even assuming, 
arguen­do
, that the gang evidence was cumulative, it did not affect Davenport's convic­tion, given his admissions and the balance of the evidence presented against him.  
People v. Nichols
, 235 Ill. App. 3d 499, 507, 601 N.E.2d 1217, 1224 (1992).

Davenport argues that the tattoo evidence was irrelevant to his case because he conceded that he was a gang member.  However, Davenport was convicted on the theory that he was a lookout for another gang member.  Thus, the State could show that the person identified as the shooter was a gang member.  See 
Gonzalez
, 142 Ill. 2d at 488, 568 N.E.2d at 867; 
People v. Knox
, 241 Ill. App. 3d 205, 211-12, 608 N.E.2d 659, 663 (1993).

Davenport also argues that the use of dual juries denied him a fair trial because the tattoo evidence related only to Clemons and thus confused the Davenport jury.  See 
People v. Brown
, 253 Ill. App. 3d 165, 179, 624 N.E.2d 1378, 1389 (1993).  However, as the tattoo evidence was relevant to show identification and motive, this argument is not persuasive.

In sum, given the facts and circumstances shown in each record on appeal, the admission of gang-related testimony was not revers­ible error.  However, the State should not conclude that our decision today approves of the way in which these cases were prosecuted or establishes a precedent for less compelling cases.

II

Davenport argues that he was denied a fair trial because he could not cross-examine Clemons regarding his tattoos.  Davenport relies on 
Bruton v. United States
, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), and 
Cruz v. New York
, 481 U.S. 186, 95 L. Ed. 2d 162, 107 S. Ct. 1714 (1987), both of which held that the use of a nontestifying codefendant's statement at a joint trial violat­ed the defendant's sixth amendment right to confront and cross-examine the witnesses against him.

It should be noted that "[t]he situation here is different from 
Bruton
 and 
Cruz
 in that here, the defendants were tried by two different juries."  
Brown
, 253 Ill. App. 3d at 181, 624 N.E.2d at 1390; see also 
People v. Johnson
, 149 Ill. 2d 118, 132-

34, 594 N.E.2d 253, 261-62 (1992)(rejecting application of 
Bruton
 in multiple jury case).  Moreover, Davenport misstates the record in arguing in his brief that "Clemons' body took the stand against Davenport as a prosecution witness ***."  Rather, the record reflects that Clemons' body was used as an exhibit or demonstrative evidence.  There is no Illinois case addressing the display of a person other than the defendant or the victim, but other states that have considered the argument Davenport makes here have reject­ed it.  
People v. Morgan
, 191 Cal. App. 3d 29, 38-39, 236 Cal. Rptr. 186, 191-92 (1987); 
State v. Kaiama
, 81 Hawaii 15, 911 P. 2d 735 (1996).  These courts concluded, as did the trial court here, that such evidence is not testimony and thus outside the right to confront and cross-examine witnesses.  

Although the record does not clearly indicate whether Clemons was forced to entirely remove his shirt for exhibition of his tattoos, the record here goes beyond the mere removal of a jacket to display tattoos, as was the case in 
People v. Speirs
, 231 Ill. App. 3d 807, 596 N.E.2d 1257 (1992).  The State certain­

ly had less inflammatory means of presenting the tattoos to the jury, such as by photographs.  
E.g., People v. Jones
, 161 Ill. App. 3d 688, 515 N.E.2d 166 (1987).  The State conceded this much during oral argument in this appeal.  Although we disapprove of the State's method of presenting this evidence, we conclude that the trial court did not clearly abuse its discretion in allowing Davenport's jury to see Clemons' tattoos.

III

Clemons argues that the trial court erred in failing to inquire into the effectiveness of his trial counsel during the post-trial hearing.  A trial court should appoint new counsel to represent a defendant who files a 
pro se
 motion asserting inef­

fectiveness of counsel.  
People v. Krankel
, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984).  As Clemons did not raise his allegation  before the trial court, he relies on 
People v. Williams
, 224 Ill. App. 3d 517, 524, 586 N.E.2d 770, 774 (1992), which held that where there is a clear basis for an allegation of ineffective counsel, the defendant's failure to raise the allega­tion below did not waive the 
Krankel
 problem; the case was remanded with directions to conduct a preliminary investigation.  The trial court was directed that if the charges lacked substance or per­

tained only to trial tactics, no new counsel need be appoint­ed; however, if trial counsel may have neglected defendant's case, the trial court was to appoint new counsel to argue inef­fective assistance of counsel.  
Williams
, 224 Ill. App. 3d at 524, 586 N.E.2d at 774.

In this case, as in 
Williams
, trial counsel failed to call witnesses to support an alibi defense.  However, the transcript of proceedings shows that counsel clearly communicated to the trial court that he did not think that the prospective witnesses could recall the proper times and events sufficiently to be good witness­es.  A trial counsel's decision regarding whether to present witnesses and what defense to assert constitute matters of trial strategy.  
People v. Ramey
, 152 Ill. 2d 41, 54, 604 N.E.2d 275, 281 (1992).  Thus, the charge of ineffective assis­

tance of counsel lacks substance and pertains only to trial tactics.  Thus, the trial court did not err in failing to examine the effective­ness of trial counsel.

IV

Finally, Clemons contends that the trial court abused its discretion in sentencing him to 59 years in prison without con­

sidering mitigating factors, such as that Clemons: was 18 years old at the time of the shooting; had no history of violent of­

fenses; had a limited education, but planned to further his education; and had rehabilitative potential.  A sentencing judge may not refuse to consider relevant evidence in mitigation.  
E.g., People v. Maxwell
, 148 Ill. 2d 116, 147, 592 N.E.2d 960, 975 (1992).  However, the trial court is not required to articu­

late its consideration of mitigating factors.  
People v. Boclair
, 225 Ill. App. 3d 331, 335-36, 587 N.E.2d 1221, 1224 (1992).  Where mitigat­ing evidence is before the court, it is presumed that the judge considered it, absent some indication, other than the sentence imposed, to the contrary.  
E.g., People v. Willis
, 210 Ill. App. 3d 379, 389, 569 N.E.2d 113, 119 (1991).

In this case, Clemons points to the trial court's comment that "[t]here is nothing to mitigate the Defendant's conduct.  Nothing whatsoever."  Similar comments have been held insuffi­

cient to show that the trial court failed to consider mitigating factors, where the whole of the record shows that such evidence was presented to and considered by the court.  
E.g., Maxwell
, 148 Ill. 2d at 147-48, 592 N.E.2d at 975; 
People v. Stewart
, 101 Ill. 2d 470, 494-95, 463 N.E.2d 677, 689 (1984).  In this case, the trial court heard argument on the aggravating and mitigating evidence, heard Clemons' statement and reviewed the pre-sentence investigation report.  The judge described the shooting as "bru­

tal," added that he was "really shocked, even as a veteran trial judge" by the case, but agreed with the State that an extended term sentence was not warranted, though the case was "close" on that point.  The trial court noted Clemons' age at the time of the shooting, but concluded that he was a "senseless, remorseless unfeeling predator" and that there was no hope for him.  The trial judge was aware that Clemons was convicted of delivery of a controlled substance prior to the shooting, and convicted of possession of a controlled substance twice after the shooting.  Given this record, the trial court's comment does not show that the mitigating evidence was ignored.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, J., and ZWICK, J., concur.