THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDGAR GOLDSBERRY, Defendant-Appellant.

First District (2nd Division) No. 1—91—0995

Opinion filed February 22, 1994.—Rehearing denied March 23, 1994.

SCARIANO, J., dissenting.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, and Wildman, Harrold, Allen & Dixon, both of Chicago (Jonathan W. Young, of counsel), for appellant.

Jack O'Malley, State's Attorney of Chicago (Renee Goldfarb, Margaret Faustmann, and Fabio Valentini, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

A jury found defendant, Edgar Goldsberry, guilty of second degree murder but not guilty of attempted murder. The charges arose from his shooting of Nathan Taylor, who died as a result of his wounds. Defendant was sentenced to a 14-year term in custody of the Illinois Department of Corrections. On appeal, defendant argues that the court erred in denying his motion *in limine* to exclude notebooks which were in his possession on the night of the shooting, purporting to show that he was a member of the High Class Gangsters, a Chicago street gang; the State did not bear its burden of proving him guilty of second degree murder beyond a reasonable doubt; and the 14-year sentence was excessive. For reasons which follow, we reverse and remand for a new trial.

At trial, the State first called Runno Thames. He testified that on the night in question, around 7 p.m., he and a group of friends walked together toward Academy of Our Lady school in the 9500 block of Throop Street on the city's southside. At the school, Thames saw two

students exiting the building staring at him. One, whom Thames identified as defendant in a lineup held the evening of the shooting and for the record at trial, carried a "Gucci" leather portfolio. Thames' companion, decedent Nathan Taylor, inquired as to why defendant continued to stare at them. He received no response. Taylor suggested that defendant must therefore know them, to which defendant manifested agreement by silently nodding his head. Thereafter, Thames saw defendant reach into his portfolio, withdraw a .38-caliber revolver, and shoot Taylor. The bullet entered Taylor's chest cavity, lacerated his heart and a lung, and proved fatal. Thames then ran from the scene of the shooting and heard further gunshots after departing. When police arrived at the scene, Thames returned and informed them of what had happened. He also gave them a notebook which fell out of defendant's portfolio when he withdrew the pistol.

On cross-examination, Thames admitted he had a prior conviction for misdemeanor theft. He knew that the victim, Taylor, was a member of the Vice Lords street gang. Before he graduated from high school, he too was a Vice Lord; on the evening of the shooting, however, he no longer was a member and had not been for some time. He denied that he or anyone else attempted to steal jewelry from defendant, or to take his jacket. Thames claimed that defendant fired without any provocation; no one had physically touched him. The closest person to defendant was decedent Taylor, who was an arm's length from defendant when he opened fire.

The State's next witness was Stacy Miller, who corroborated much of Thames' testimony. At the time of the shooting, he was running to catch up to Taylor and Thames, after stopping to speak to an acquaintance. At the scene, he could not clearly identify the shooter but recalled that he carried a portfolio. After firing at Taylor, the shooter aimed in his direction. Miller ran in the opposite direction and, soon thereafter, he was told that he had been shot in the groin area. On cross-examination, Miller admitted he was Thames' cousin and was acquainted with some members of the Vice Lords, including Thames. He denied that, at the time of the shooting, defendant was being assaulted.

Chicago police officer Stanley Johnson testified for the State. He arrived at the scene of the crime, called for medical assistance for Taylor, and recovered the notebook that Thames indicated had fallen from the perpetrator's bag. Detective David Friel testified that he found defendant's name on its inside cover. After learning of his address from school officials, Friel proceeded to his home, where defendant lived with his mother. There he found a Gucci portfolio lying on the bed in defendant's room along with another notebook, which,

like the one found on the scene, contained drawings and poems admittedly penned by defendant. These notebooks had been the subject of defendant's motion *in limine*, where he maintained that they had no probative value, but would only be used by the State to incite the jury's passion. The court denied defendant's motion *in limine*. The State offered the notebooks into evidence. Defendant reasserted his earlier objection, which was again overruled, and he moved for a mistrial which was also denied.

Thomas McMahon, a Chicago police officer with 12 years' experience as a gang-crimes specialist, was qualified as an expert. He explained the significance of the writings and drawings in the notebook. In his opinion, the drawings manifested disrespect toward the Vice Lords. The poems were generally consistent with membership in the High Class Gangsters, bitter enemies of the Vice Lords. On cross-examination, McMahon admitted he could not say that the events depicted in the poems he interpreted actually occurred or were merely the figment of a creative mind. The area around 95th and Throop was within Vice Lord-controlled territory.

The State's final witness was Tommy West. On the night of the shooting, he had parked his automobile across the street from Academy of Our Lady while waiting for his son to emerge from the school. He observed two individuals exit the school, one of whom he identified for the record as defendant who, at the time, carried a "Gucci bag." He saw the two men standing on the sidewalk near the curb, and two other men standing in the middle of the street. He watched as defendant pulled a pistol out of the portfolio and shot one of those two men in the chest. Defendant then turned and shot another man who was running up to the scene in the leg. West ordered the shooter to stop firing, whereupon defendant pointed the gun in his direction and fired a round which impacted on the dashboard of his car, narrowly missing his head. While West hid behind seats in the car, he observed defendant approach and fire another shot toward him. Police technicians discovered a bullet in the dashboard of West's auto. A photo of West's windshield, which showed that it was marred by a bullet hole, was received into evidence. After defendant fired the rounds in his direction, he ran down Throop Street. On cross-examination, West admitted that he was too distant from the men to hear anything they might have said to each other.

Defendant called Mark Hatcher, who testified that on the night of the incident he observed six youths wearing hats turned to the left walk down Throop Street toward the Academy of Our Lady. They all brandished sticks and, as they walked, Hatcher overheard them speak of "getting someone from the school." He paid little attention to the rest of their conversation. Later, he heard shots ring out.

Defendant then took the stand in his own defense. He admitted that when he was younger, he was a gang member, but that his mother sent him to Georgia in order to remove him from the gang environment of his neighborhood. Since his return from Georgia in 1987 he had not rejoined the gang, but he was a student attempting to finish high school. He enjoyed listening to rap music and viewed himself as a rap artist. He wrote lyrics constantly. The lyrics in his notebook, which Officer McMahon suggested tended to show his gang membership, were, in fact, written in the vein of gangster rap because that is the most marketable type of rap music. The drawings in the notebooks were also intended to convey the hard, ghetto life, like his music.

On February 14, 1989, after finishing class at Academy of Our Lady, defendant went to a nearby restaurant for dinner and he saw a group of teens assault an individual outside the restaurant. The victim broke away, entered the restaurant, and vaulted the counter. Several teens entered the restaurant and told defendant that they wanted his jacket and jewelry, but left the store after an employee called police. Defendant spoke to the police, drove home and played basketball. He later told a friend what had occurred. The friend gave him a pistol for his protection, suggesting that he carry it with him when he went into the neighborhood around Academy of Our Lady. Defendant stored the gun in his portfolio.

On February 16, 1989, defendant carried the revolver in his Gucci bag as he exited the school building. He stood in front of the building waiting for a ride home. He was approached and surrounded by men, a few of whom were carrying sticks. Some of them said "What's up? What's up?" which he took to be a gang representation. A few of them wore baseball caps with the bills pointed to the left. Defendant interpreted this as signifying that they were affiliated with the "People," who were gang members. He became scared, put his hand into his portfolio, and was beaten. He withdrew the pistol in response and fired four quick shots with his eyes closed and ran from the scene. None of his attackers had guns visible. He suffered no cuts or bruises from his assault. He ran, caught a cab home, and went to his brother's girlfriend's house where his mother contacted him later, informing him that the police sought him for questioning. He voluntarily surrendered to police.

In rebuttal, the State called Detective James Butler who, on the night of the shooting, spoke with defense witness Hatcher. Hatcher did not mention to him seeing stick-brandishing boys walking down Throop Street in the vicinity of Academy of Our Lady. The State also offered the testimony of Detective George Karl, who twice interviewed

defendant on the evening of February 16, 1989. Defendant did not tell him that his assailants carried sticks. Instead, he told Karl that they had beaten him with their fists. Defendant stated that he fired his first shot into the air to scare off his attackers, and then fired the second round into the crowd.

The jury found defendant guilty of second degree murder for the death of Taylor, but not guilty of attempting to kill Stacy Miller. The trial court sentenced him to 14 years in custody of the Illinois Department of Corrections. Defendant appeals.

Defendant first asserts that the introduction of the notebooks into evidence against him constituted prejudicial error. The notebooks contained drawings of gang insignia and rap lyrics. A prosecution expert later testified that the contents of the notebook were consistent with gang membership. Prior to trial, defendant brought a motion *in limine* seeking to exclude the notebooks, maintaining that they possessed little probative value, yet were highly prejudicial against him. The State informed the court that it would use the notebooks along with expert testimony explaining the substance of their contents in order to establish defendant's motive for killing the victim and attempting to kill another, both of whom were members of a rival gang.

Evidence such as the notebooks at issue here, which tends to suggest that a criminal defendant has gang affiliations, poses unique problems when offered in a case tried before a jury because, as the courts have acknowledged, "there is a deep, bitter and widespread prejudice against street gangs in every large metropolitan area in America." (*People v. Parrott* (1976), 40 Ill. App. 3d 328, 331, 352 N.E.2d 299, 302; see also *People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900.) The fact that gang membership conjures up a negative image in the mind of the normal juror does not, however, preclude the admission of all such evidence on a *per se* basis. (*Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.) Evidence of gang affiliation is admissible if relevant to an issue other than merely to cast the accused in a scurrilous light. Evidence of gang membership may be received in order to show a common design or existence of a motive which would be relevant to prove an otherwise inexplicable act. *Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907; *People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840, 854; *People v. Buchanan* (1991), 211 Ill. App. 3d 305, 320, 570 N.E.2d 344, 355, *appeal denied* (1991), 141 Ill. 2d 547, 580 N.E.2d 121.

A challenge to such evidence purportedly offered to prove motive requires the circuit court to determine whether defendant's gang affiliation *is related to the crime charged.* (*Smith*, 141 Ill. 2d at 58,

565 N.E.2d at 907; *People v. Rivera* (1986), 145 Ill. App. 3d 609, 618, 495 N.E.2d 1088, 1094.) This requisite is satisfied where the evidence established in some slight degree the existence of the motive relied upon or alleged. (*Smith*, 141 Ill. 2d at 56, 565 N.E.2d at 906.) Defendant urges that, under *Smith*, the State failed to meet this prefatory step; therefore, the court erred in denying his motion to exclude the notebooks.

 In the case *sub judice* there was no evidence presented from which the circuit court could infer that, at the time of the shooting, defendant was a member of the High Class Gangsters; was engaged in any gang or gang-related activity; or shared a gang's enmity toward the victims. Although the State's expert on gangs and gang crimes testified that the drawings and the lyrics within the notebooks were consistent with membership in the High Class Gangsters, the link between the notebooks and the shooting was nonexistent. There was no evidence whatsoever that the shootings of Taylor and Miller were in any way gang-related. Instead, the record, to a degree, supports defendant's version of events and provides the necessary motive: that defendant was placed in fear of his life when Taylor and Thames, his companion, approached and confronted him before the shooting. There was evidence that defendant was surrounded by stick-bearing youths wearing caps tilted to the left; defendant was punched in the face by Taylor; and defendant removed the weapon from his portfolio and admittedly fired four shots, one of which struck and killed Taylor. When he pulled out the gun, the notebooks fell out of the portfolio and were turned over to police. The fact that defendant recognized the victims as being members of the Vice Lords, and that he feared them for that reason on the night of the shooting, lends no credence to the inference that he himself was a member of the High Class Gangsters, whose members the Vice Lords would have attacked, or that this was the motive for the shooting. In summary, defendant was in school, where he belonged. When he exited school with a friend he was confronted by the victim and others who had no business in the school. He was not participating in any gang-related activities at that time whatsoever. To hold that the shooting was gang-related because he wrote about gangs and depicted them in his notebooks stretches the rule beyond reason.

Defendant correctly notes that the State's expert acknowledged that the drawings and writings in his notebooks did not unequivocally establish that defendant was, in fact, a member of the High Class Gangsters. Although the State need not prove gang membership beyond a reasonable doubt, or by a preponderance, the evidence must establish "at least to a slight degree" the basis of the alleged motive.

(*Smith*, 141 Ill. 2d at 56, 565 N.E.2d at 906; see also *People v. Easley* (1992), 148 Ill. 2d 281, 326, 592 N.E.2d 1036, 1056.) The evidence presented here through the expert's interpretation of sketches and lyrics failed to meet this standard. The circuit court erred in allowing the State to use the notebooks as substantive evidence against defendant.

Although evidence of defendant's gang membership was highly conjectural and offered little probative value, it seriously disparaged him before the jury. The notebooks were not probative, yet became the linchpin of the State's case against defendant. The circuit court also erred in finding that the probative value of the notebooks outweighed their prejudicial effect, thereby denying defendant's motion *in limine* to exclude them.

Defendant argues, alternatively, that the circuit court erred in admitting the notebooks because the State never established that he was an active member of a gang at the time of the shooting, citing *People v. Cruz* (1987), 164 Ill. App. 3d 802, 518 N.E.2d 320, *appeal denied* (1988), 121 Ill. 2d 574, 526 N.E.2d 834. In *Cruz*, the introduction of a videotaped documentary filmed three months before defendant there allegedly attempted to murder a member of a rival gang constituted reversible error. At his trial, defendant took the stand and on cross-examination stated that he ended his affiliation with a gang in 1978 and joined no other after that. The State showed the documentary made in 1981 wherein defendant could be seen discussing his gang activities with a policeman *circa* September or October 1981, purporting to offer it to impeach defendant's testimony that he was not a gang member after 1978.

Defendant also alternatively challenges the admissibility of the notebooks against him because the lyrics in the notebooks, as translated by the State's gang-crimes expert, tended to implicate him for other crimes for which he had not been indicted and the court erred in allowing the jury to learn, via the notebooks, of those crimes. In order to justify the admission in evidence of other crimes to establish motive, the State must prove that the other crimes actually took place and that defendant committed or participated in their commission. *People v. Mitchell* (1984), 129 Ill. App. 3d 189, 197, 472 N.E.2d 114; *People v. Brozan* (1987), 163 Ill. App. 3d 73, 80, 517 N.E.2d 285.

■ The State claims that defendant has once again waived this issue by failing to raise it in his motion for a new trial. Defendant alleged that the notebooks were irrelevant and overly prejudicial by his motion *in limine*; he objected to the use of the notebooks at trial; and, with his post-trial motion, he highlighted the prejudicial infirmity of the evidence. This was sufficient to "focus[ ] the attention of

the trial judge upon those aspects of the proceedings of which the defendant complains." (*People v. Young* (1989), 128 Ill. 2d 1, 39, 538 N.E.2d 461, 468.) Further, the supreme court has "long recognized that the 'responsibility of a reviewing court for a just result'" may sometimes outweigh considerations of waiver that arise under similar circumstances. *People v. Hudson* (1993), 157 Ill. 2d 401, 425, quoting *People v. Wilson* (1993), 155 Ill. 2d 374, 379, 614 N.E.2d 1227.

The admission in evidence of defendant's notebooks, which were utilized by the State as evidence that he could not have shot Taylor or Miller with lawful justification, deprived defendant of a fair trial and requires that this cause be reversed and remanded for a new trial.

We need not consider other issues raised by defendant since we reverse and remand this cause for a new trial without the admission of evidence of defendant's notebooks.

Reversed and remanded with directions.

McCORMICK, P.J., concurs.

JUSTICE SCARIANO, dissenting:
I respectfully dissent. Although I agree with the majority that the circuit court erred in allowing the State to use defendant's notebooks against him, I would hold it to have resulted in no prejudice to defendant and that the error was therefore harmless because even without the irrelevant notebooks, there was more than abundant evidence presented by the State to sustain the jury's verdict that defendant was guilty of second-degree murder. See *People v. Maldonado* (1992), 240 Ill. App. 3d 470, 608 N.E.2d 499; *People v. Portis* (1986), 147 Ill. App. 3d 917, 498 N.E.2d 675; *cf. People v. Gonzalez* (1989), 188 Ill. App. 3d 559, 544 N.E.2d 1044 (reversing the defendant's conviction for erroneous admission of gang membership evidence only after concluding that the inadmissible evidence prejudiced the defendant).

Defendant's theory of the case was that he fired the weapon he carried in apprehension of his safety, a fear instilled by the overtly threatening conduct of Runno Thames, Nathan Taylor and their companions. He also testified that he fired only after he was provoked by the gang members who beat him. However, with the exception of defendant's self-serving testimony and the faulty recollections of Mark Hatcher, no evidence presented significantly corroborates his version of the events of the evening of February 16, 1989.

First, defendant's conduct on the night in question belies his contention that he was the innocent victim of a gang assault, and his

relative incredibility may explain why the jury chose not to find his shooting of Taylor justified. Immediately after shooting the weapon he fled from the scene and went not to his own home, but to his brother's girlfriend's home, a location where it would likely be difficult for police to find him. He surrendered himself to police only after his mother informed him that the police sought him for questioning. One would think that an individual who had endured defendant's experiences would not immediately flee the scene, but instead would actively seek out the authorities, or, at the very least, would stay to explain to the police who would inevitably arrive why he was compelled to fire a deadly weapon not only at Taylor and Miller, against whom defendant claims he was defending himself, but also why he fired two carefully aimed shots at West, an innocent by-stander who was waiting for his son to emerge from school and whose only offense *vis-a-vis* defendant was to tell him to stop firing. In fact, defendant's second shot at West was fired while defendant was approaching him and while West was shielding himself from the gunfire by hiding behind the seats of his car.

In addition, there are unexplained inconsistencies in defendant's testimony which raise grave doubts as to the veracity of his story. At trial, he attested that he was attacked by a group of gang members brandishing sticks. This version differed from the one he initially gave police in which he twice omitted reference to sticks, telling police only that his attackers beat him with their fists. Even these first two tales are uncorroborated by physical evidence, since defendant bore no physical marks or bruises to substantiate any beating.

Most important, without regard to the untenability of defendant's self-proclaimed justification for the shooting, I consider the State's evidence of his guilt exclusive of the inadmissible notebooks to be extensive. For example, it offered the testimony of Runno Thames, an eyewitness, who stated that prior to the incident, no one in his group even touched defendant, but that the shooting was triggered by a simple verbal confrontation between defendant and Taylor. According to Thames, when defendant first fired the weapon, the decedent was the closest to him and, at that time, he was more than an arm's length away. Taylor's version was corroborated by Miller, another of defendant's victims, who agreed that there was no assault prior to the shooting. Miller added that the shot which hit him in the groin was carefully aimed by defendant, contrary to defendant's testimony that he fired four quick shots with his eyes closed. West also testified that defendant, as the majority acknowledge, "turned and shot" Miller.

Indeed, I consider West's testimony most persuasive. He testified that he watched the shooting from a position which afforded him an

unobstructed view, and that he saw defendant emerge from the Academy of Our Lady and confer with two individuals in front of the school. Soon thereafter, defendant pulled out a pistol from his portfolio and fired it at one of the youths. West did not refer to any provocation which preceded the shooting and which would lead the jury to infer that defendant was justified. In fact, he stated that at the time of the shooting, defendant was standing on the sidewalk and the victim was in the middle of the street, thus suggesting that no assault actually preceded, much less precipitated, defendant's use of the pistol.

I find nothing in the record which discredits West or which indicates that he was worthy of less than the complete belief the jury must have accorded him; thus, I find his testimony alone sufficient to establish the elements of the crime for which defendant was convicted, namely, second-degree murder. (Ill. Rev. Stat. 1991, ch. 38, par. 9—2; see *People v. Fausz* (1983), 95 Ill. 2d 535, 449 N.E.2d 78 (holding that a person commits second-degree murder if, *inter alia*, she intentionally kills another believing that the circumstances justify her acts, but the belief is found to be unreasonable).) Our supreme court has held that "[w]hen the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result, the conviction may be affirmed." (*People v. Arman* (1989), 131 Ill. 2d 115, 124, 545 N.E.2d 658, 662.) Since there exists enough proper evidence in the record even excluding the challenged evidence, to establish defendant's guilt for second-degree murder beyond a reasonable doubt, I would affirm defendant's conviction for that crime.