THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ENOCH WILDER, Defendant-Appellant.

First District (5th Division)    No. 1—99—1425

Opinion filed March 30, 2001.*

---

*The opinion filed March 30, 2001, was withdrawn and a new opinion was filed October 12, 2001. The new opinion is published at 325 Ill. App. 3d 987.

THEIS, J., specially concurring.

Rita A. Fry, Public Defender, of Chicago (Thomas F. Finegan, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Defendant Enoch Wilder (Wilder) was found guilty of first degree murder, armed robbery, and aggravated kidnaping after a jury trial. The court sentenced him to an aggregate 60-year sentence: 45 years for first degree murder, 15 years for armed robbery and 15 years for aggravated kidnaping, with the 15-year sentences concurrent to each other and consecutive to the 45-year sentence. Defendant filed a motion for a new trial and a motion to reconsider his sentence. Both motions were denied and this appeal followed. We affirm in part and vacate in part.

Prior to the start of the *voir dire*, defense counsel advised the court that there had been difficulty in obtaining proper trial clothing for the 450-pound defendant. He stated that the defendant's brother had intended to purchase clothes for the defendant, but lacked the funds to do so. Defense counsel requested a 30-day continuance to enable the defendant to obtain presentable clothing for trial. The prosecutor then suggested that the investigators from the public defender's office could purchase clothing for the defendant. However, the judge noted that the case had been previously set for trial and that the clothing situation should have been resolved earlier. Accordingly, he denied defendant's motion. The defense attorney then responded that it was unconstitutional to have the defendant sit in front of a jury in a torn Department of Corrections outfit. The court reiterated that the clothing situation had not arisen unexpectedly and that it was something that defendant had over three years to resolve. The jury selection then began.

At the conclusion of the *voir dire*, the defense objected that the defendant's mention of gang affiliation in his court-reported confession was prejudicial and inflammatory since the case did not involve gang membership. The confession given to Assistant State's Attorney Stephen DiNolfo read in pertinent part:

"Q. Are you in any gang?

A. Yes.

Q. What gang are you in?

A. Vice Lord.

A. And how long have you been a Vice Lord?

A. 15 years.

Q. Do you have a nickname?

A. Yes.

Q. What is your nickname?

A. Big Murder or Woo."

The statement then described defendant's activity on the night of November 3, 1995. During that recitation, DiNolfo directed the

defendant's attention to the gang memberships of the other individuals who participated in the incident:

"Q. Do you know if Nose is in a gang?

A. Yes.

Q. What gang is he in?

A. Chief of Mafia Vice Lord.

Q. What about Sko?

A. He is Mafia Vice Lord.

Q. And Antoine?

A. Mafia Vice Lord.

Q. What about Butter?

A. Unknown Vice Lord."

The court found that since the information about defendant's gang membership came from the defendant's statement and not from a third party, the defense was essentially asking the court to order the State to redact defendant's own statement. Accordingly, the court ruled that defendant's entire statement was admissible and that the State would not have to remove any of the gang references made by defendant therein.

Before the start of trial on the next day, the defendant, now dressed in civilian clothing, renewed his objection to the fact that the jury observed the defendant in prison clothing on the previous day and asked the court to dismiss the panel. The court indicated that while defendant requested a 30-day extension to obtain new clothing, no one had asked for a one-day continuance—something to which the court may have been more amenable. The court also reiterated that the defendant had ample opportunity to have proper clothing purchased for him due to the extensive period of time that the case was pending. Accordingly, the court denied defendant's renewed objection as well as his motion for a new trial.

At trial, a number of witnesses were called to relate the events of November 3, 1995. On that night, at 1420 S. Avers in Chicago, Robbie Barrett was killed by a gunshot wound to the back of the neck. Behind the home at that address, Jimmie Johnson operated a mechanic's garage where his brother, Robert Johnson, and Winorva Nichols worked as mechanics. The three were also involved in the sale of rock cocaine out of the garage. After returning home from dinner that evening, Robert Johnson found a man known as "Jamaica" waiting for him by the garage with the defendant in a burgundy Cadillac. Jamaica had spoken with Jimmie Johnson on November 2, 1995, about borrowing a battery. He had spoken to Winorva earlier that day about it, but was told that he needed to speak with Robert Johnson. When Jamaica finally spoke to Robert that night, he told him that he needed

to borrow the battery to get his van running in order to bring some tools to the garage. Robert told Jamaica that the only battery he had was being charged for the car he was selling to Robbie Barrett.

Afterward, defendant and Jamaica went to "Theresa's" house where they met with Butter, Nose, Antoine, and Sko. Nose stated that he wanted to commit a robbery that night and Jamaica stated that he knew of a place to rob. The defendant, Jamaica, Nose, Antoine, Butter, and Sko then armed themselves and got into the van Jamaica was driving.

At approximately 11 p.m., Robert Johnson and Winorva Nichols were in the alley behind 1420 S. Avers working on cars when a tan van pulled up to the garage and trapped Robert and Winorva between the cars they were repairing. Three armed people exited the van wearing ski masks. The three told Robert Johnson and Winorva Nichols to go inside the garage and demanded all of their money and drugs. Between $20 and $60 was taken from Robert Johnson along with two or three bags of rock cocaine. The men took $65 and four or five rocks of cocaine from Winorva Nichols.

Also around that time, Robbie Barrett flagged Jimmie Johnson down in his tow truck to buy a car which he had earlier discussed with Jimmie. Robbie Barrett went home to get the $425 for the car, and when he returned, exchanged the money for the title with Jimmie. Robert Johnson, who was lying down in the garage at that point, stated that he heard one man enter the garage, whisper to one of the other offenders, and then leave the garage. They returned with Robbie Barrett. After a brief struggle, one of them shot Robbie. The offenders then opened the garage door and ran to the van, which departed the scene.

According to defendant's confession, when the van pulled up to the garage, there was a man in the alley. Nose then told them to "take care of business," and Antoine, Sko, and Butter all got out of the van with guns. Nose spotted Robbie Barrett walking around to the garage and told defendant to go "get him." After defendant shoved Barrett in the direction of Sko, they frisked Barrett and retrieved some money. They then ordered Robbie Barrett to lie on the ground, which he did next to Butter. According to defendant, Butter said nothing and shot Robbie Barrett in the back of the head. The men then jumped into the van and pulled away. Later that night, Nose divided up the proceeds, and defendant received $20 and a "blow" of heroin.

After trial, the defendant was found guilty of the armed robbery of Winorva Nichols, the armed robbery of Robert Johnson, the aggravated kidnaping of Robbie Barrett, and the first degree murder of Robbie Barrett and was sentenced to an aggregate of 60 years: 45 for

first degree murder and 15 years each for armed robbery and aggravated kidnaping. The 15-year sentences were ordered to be served concurrent to one another and consecutive to the 45-year sentence. In giving that sentence, the court took notice of a previous conviction of armed robbery, the defendant's conduct on November 3, 1995, and his involvement in an armed robbery which occurred on November 7, 1995. Accordingly, the judge determined that consecutive sentences were appropriate in the present case in order to protect the public from further criminal conduct by the defendant. Defendant moved for a new trial, again arguing the issue of defendant's clothing. That motion was denied, and defendant now appeals.

Defendant's first argument is that his conviction should be reversed and the cause remanded for a new trial because evidence of his gang membership was unfairly and prejudicially injected into the trial. Before trial, the defense argued that the defendant's reference to his street gang affiliation in his confession should be excluded as prejudicial and irrelevant because it had nothing to do with the facts of the case. The judge disagreed, and stated that it was relevant to the manner in which the crimes were committed.

■ The standard of review for evidentiary rulings on gang-related evidence is an abuse of discretion standard. *People v. Gonzalez*, 142 Ill. 2d 481, 489-90 (1991). "[E]vidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act." *People v. Smith*, 141 Ill. 2d 40, 58 (1990). However, evidence of gang membership "is only admissible where there is sufficient proof that such membership or activity is related to the crime charged." *Smith*, 141 Ill. 2d at 58. Where there is such paucity of evidence that an offense was gang related, introduction of gang evidence at trial constitutes reversible error. *People v. Goldsberry*, 259 Ill. App. 3d 11 (1994). As with other evidence, gang membership evidence is admissible only if relevant to an issue in dispute and where its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 159 Ill. 2d 97, 118 (1994). "An accused may not insulate the trier of fact from his gang membership where it is relevant to a determination of the case, simply because prejudice attaches to that revelation." *People v. Hendrix*, 250 Ill. App. 3d 88, 104 (1993), citing *Gonzalez*, 142 Ill. 2d 481.

Defendant claims that the offenses in this case were fairly straightforward, without any gang implications or nuances, as they were all committed with one objective in mind: to steal money and drugs. Further, defendant claims that with regard to the contention that Nose, a chief of the Mafia Vice Lords, had orchestrated the rob-

bery and the ensuing events, such similarity in gang affiliation "was merely incidental to the incident." He claims that such an affiliation "had no bearing on the planning or carrying out of the incident," as there was no correlation between the group's actions that night and gang membership. In fact, because Nose never invoked any gang authority or hierarchy in directing the group's actions, it was just as likely that his criminal knowledge and planning skills were responsible for his direction of the participants. Likewise, he continues, if "several members of a high school football team were to burglarize a clothing store it would not be accurate to describe their activity as sport related or school related."

The State responds that the court did not abuse its discretion in allowing defendant's statement that he was a member of the Vice Lords street gang, that information being relevant to the charges against the defendant. Among the individuals defendant was with prior to the armed robbery and murder was Nose, whom defendant stated was the chief of the Mafia Vice Lords. Sko and Antoine, like Nose, were members of the Mafia Vice Lords, and Butter was a member of the Unknown Vice Lords. According to defendant's court-reported statement, Nose told defendant, Jamaica, and others that they needed to "go hit a lick" or hold someone up. After Nose made this demand, Jamaica said he knew of a place to go. Once they arrived, Nose instructed Sko, Antoine, and Butter to "go take care of business," meaning to hold them up. Moreover, once Robbie Barrett approached the garage, it was Nose who instructed defendant to get him. Defendant followed instructions and took Barrett into the garage. After the group left the scene, they returned to the house where the crime was planned and Nose divided up the proceeds of the robbery.

While the special concurring opinion would like us to believe that it is Nose's leadership qualities that allow him to seemingly give all of the orders and make all of the major decisions, it is a reasonable inference that it is his role as chief of the Mafia Vice Lords that allows him to (i) decide that it is time to rob someone; (ii) instruct the group that he approved the site of the robbery; (iii) direct the defendant to go after the victim; and finally (iv) to be the person who takes the loot and thereafter divides it among the participants.

The special concurrence concludes that because the gang-related evidence does not link these crimes from the perpetrators to the victims, the trial court erred in admitting this evidence. We agree that evidence of a defendant's gang affiliation, by itself, should not be used to establish the relationship of a gang motive to the crime charged, as such evidence then has great potential to result in an automatic assumption of guilt arising from the deep and widespread public

prejudice against street gangs. On the other hand, we also believe that a defendant need not commit a crime typically thought of as gang-related—such as a drive-by shooting—for it to be gang-motivated. Indeed, gang members plan and engage in countless criminal acts where the fact of their membership may not be evident from the commission of the crime, yet is readily evident from and connected to the crime's planning and motivation. We believe such an instance exists here.

■ As previously stated, gang-related evidence "is only admissible where there is sufficient proof that such membership or activity is related to the crime charged." *Smith*, 141 Ill. 2d at 58. In this case, defendant's confession relates the following sequence of events: Defendant and Jamaica met Butter, Nose, Antoine and Sko, all of whom were somehow affiliated with the Vice Lords, at Theresa's house. Nose, whom defendant recognized as chief of the Mafia Vice Lords, stated that he wanted to commit a robbery. Once they arrived at the garage, Nose told the group to "take care of business." Nose then spotted Barrett walking around the garage and told defendant to go "get him." After the crimes were committed and the perpetrators fled the scene, Nose divided the proceeds among them. We read this confession as stating that Nose exercised his gang leadership authority in organizing and planning the robbery; directing all participants once they arrived upon the scene; specifically directing defendant to get Barrett; and finally, dividing the proceeds once the crime had been committed. In other words, defendant's confession made evident the existence of a gang hierarchy in that one individual directed the commission of this crime.

"The testimony regarding gang hierarchy is relevant and admissible to explain an otherwise inexplicable act and to establish a motive for the [crime], *i.e.*—advancement within the ranks." *People v. Davenport*, 301 Ill. App. 3d 143, 151 (1998). In truth, were defendant and his confederates to refuse to comply with Nose's bidding, it would have likely resulted in more troublesome consequences for them than if they had refused a peer who was not chief of the Mafia Vice Lords. Consequently, we find the trial court's holding that the gang-related evidence related to the crime to be entirely reasonable. Because this court is to reverse only when no reasonable person could adopt the view taken by the lower court (*In re Marriage of Getautas*, 189 Ill. App. 3d 148, 153 (1989)), we affirm the trial court's decision to allow the evidence as relevant.

■ Defendant's next argument is that his conviction should be reversed and the cause remanded because he appeared in jail clothing during the jury selection process. For this, he argues that courts have

traditionally recognized the potential harm which results from requiring a defendant to appear in jail clothing at a jury trial. *Estelle v. Williams*, 425 U.S. 501, 504-05, 48 L. Ed. 2d 126, 130-31, 96 S. Ct. 1691, 1693 (1976). Furthermore, it may be error when a defendant is required to appear in jail garb before a jury when a brief continuance would have allowed the defendant to obtain proper clothing and thus avoid the stigma of appearing in jail clothing. *People v. Steinmetz*, 287 Ill. App. 3d 1, 6-7 (1997). The standard of review for the issue of the granting of a continuance is whether or not the trial court abused its discretion in ruling on the requested continuance. *People v. Rodgers*, 288 Ill. App. 3d 167, 171-72 (1997).

Admittedly, defendant is not questioning the court's denial of his request for a 30-day continuance and states, "[c]learly such an extended period of a continuance was not warranted at that stage of the proceedings." What he does question, however, is the court's failure to resolve the issue by ordering a one-day continuance. Again, he admits that while he never specifically asked for a one-day continuance, "the judge should have used his discretion and he should have given the defense a brief opportunity to acquire proper clothing for the defendant." Such an oversight, he claims, amounts to an abuse of the court's discretion.

■ The State correctly responds that the issue of whether the trial court should have granted a one-day continuance is not properly before this court, since defendant never requested such a continuance. Moreover, to require the trial court to grant, *sua sponte*, a continuance for a period of time not requested is beyond the duty of the court and shifts the duties of the defense attorney to the trial judge. The State quotes *Estelle* for this proposition:

> "Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made *** during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system." *Estelle*, 425 U.S. at 512, 48 L. Ed. 2d at 135, 96 S. Ct. at 1697.

Because defendant only made his request for a 30-day continuance, the issue of whether the court should have granted a one-day continuance is beyond this court's review.

■ However, assuming that the court considered granting the one-day continuance to defendant *sua sponte* and still refused, a continuance does not seem required under *Steinmetz* and *Estelle* given the facts of this case. As previously noted, the grant or denial of a motion for continuance is at the sound discretion of the trial court. *People v. Gosier*, 145 Ill. 2d 127, 157 (1991). And under *Estelle*, the State cannot

compel a defendant to stand trial before a jury while dressed in identifiable prison clothing. *Estelle*, 425 U.S. at 504, 48 L. Ed. 2d at 130, 96 S. Ct. at 1693 (adopted by this court in *People v. Wilkes*, 108 Ill. App. 3d 460 (1982)). However, "where a defendant has ample opportunity to secure civilian clothing and then appears in court wearing jail attire, he cannot claim denial of a fair trial." *People v. Partee*, 157 Ill. App. 3d 231, 253 (1987), citing *People v. Medley*, 111 Ill. App. 3d 444, 448 (1983).

Here, as the court points out, defendant had ample time (three years) to acquire civilian clothing before his trial date and was able to do so on the second day of trial. Moreover, the trial transcript reflects that defendant's case was set for trial two times before February 8, 1999: November of 1997 and December of 1997. This is quite unlike the facts in *Steinmetz*. There, the defendant's attorney had contacted the jail twice to ensure that the defendant was taken to court in civilian clothes. However, defendant was still taken to court in his jail attire. *Steinmetz*, 287 Ill. App. 3d at 6. In other words, unlike the case at bar, the defendant in *Steinmetz* made a genuine effort to secure appropriate clothing for trial. Here, defendant told his attorney that he would handle it, proceeded to wait for his brother who had insufficient funds, and then moved for a 30-day continuance. In addition, showing up to court on the next day in civilian clothes belies his assertion that such a motion was anything other than a delaying tactic. Consequently, we find that the trial court did not abuse its discretion for failing to order a one-day continuance, where such a motion was never properly before the trial court and the facts of the case do not summarily support a grant of the motion even if it was.

■ Defendant's last argument is that the trial court improperly imposed consecutive sentences under section 5—8—4(b) of the Unified Code of Corrections (730 ILCS 5/5—8—4(b) (West 1998)). Section 5—8—4 provides in pertinent part:

"(a) *** The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless:

(i) one of the offenses for which defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury ***[.]
* * *
(b) The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to

protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record \*\*\*." 730 ILCS 5/5—8—4(a), (b) (West Supp. 1999).

Defendant notes that when read together with subsection (a), the plain and ordinary meaning of these two subsections is that consecutive sentences under subsection (b) can only be imposed on offenses where any of the exceptions of section 5—8—4(a) apply and the offenses occurred in a single course of conduct. See *People v. Bole*, 155 Ill. 2d 188, 197 (1993) (holding that where the offenses are committed in separate courses of conduct, subsection (a) is inapplicable). Thus, subsection (b) can only apply to situations where the criminal objective has changed. *People v. Porter*, 277 Ill. App. 3d 194 (1995). Defendant's argument here is that the offenses of which he was convicted arose out of a single course of conduct in which there was no substantial change in the nature of the criminal objective, and consequently, he cannot be sentenced under section 5—8—4(b). However, we need not reach defendant's substantive argument, as our own analysis of the propriety of section 5—8—4(b) reveals that it is unconstitutional under the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

Although defendant does not raise the issue of section 5—8—4(b)'s constitutionality in his brief, we raise the issue pursuant to our authority under Supreme Court Rule 366. 155 Ill. 2d R. 366. Under Supreme Court Rule 366(a)(5), we have the authority to "enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief, including a remandment, a partial reversal, the order of a partial new trial, the entry of a remittitur, or the enforcement of a judgment, that the case may require." 155 Ill. 2d R. 366(a)(5). Consequently, we have the authority to affirm or reverse the judgment of the circuit court on any ground supported by the record. 155 Ill. 2d R. 366; *In re Marriage of Chapman*, 297 Ill. App. 3d 611, 619-20 (1998), citing *Cohn v. Checker Motors Corp.*, 233 Ill. App. 3d 839, 843 (1992).

Although a reviewing court will usually not decide a constitutional issue if a case can be decided on other grounds (*People ex rel. Waller v. 1990 Ford Bronco*, 158 Ill. 2d 460, 464 (1994), citing *Exchange National Bank v. Lawndale National Bank*, 41 Ill. 2d 316, 321 (1968)), we feel that we must do so in this case because of overriding considerations of *Apprendi*'s impact on the Unified Code of Corrections. Indeed, we would be careless if, finding as we do that section 5—8—4(b) is unconstitutional, we remained silent and permitted sentencing under that section to continue unfettered. "It is hornbook

law that an unconstitutional statute is void. (*Van Driel Drug Store, Inc. v. Mahin* (1970), 47 Ill. 2d 378, 381; *People ex rel. Barrett v. Sbarbaro* (1944), 386 Ill. 581, 590; *People v. Schraeberg* (1932), 347 Ill. 392, 394; *City of Ottawa v. Hulse* (1928), 332 Ill. 286, 293.)" *In re Contest of the Election for the Offices of Governor & Lieutenant Governor Held at the General Election on November 2, 1982*, 93 Ill. 2d 463, 471 (1983). See also *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 523 (1990) (where the supreme court considered the constitutionality of a statute *sua sponte*).

In *Apprendi*, the Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. Since *Apprendi* was issued, this court has found section 5—8—4(a) to be unconstitutional because "it allows the trial court to impose consecutive sentences upon making one or more factual findings, namely, that offenses were committed as part of a single course of conduct and, in some cases, that the defendant inflicted severe bodily harm." *People v. Harden*, 318 Ill. App. 3d 425, 428 (2000), citing *People v. Clifton*, Nos. 1—98—2126, 1—98—2384 cons., slip op. at 49-55 (September 29, 2000), and *People v. Carney*, 317 Ill. App. 3d 806, 813 (2000).

> "In doing so, the courts in both *Clifton* and *Carney* acknowledged that an order that sentences run consecutively does not enhance any individual sentence beyond the prescribed statutory maximum. Both courts concluded, however, that, under *Apprendi*, it is the effect of a statute, rather than its form, that controls and that the effect of an order requiring that sentences run consecutively is to increase the defendant's sentence." *Harden*, 318 Ill. App. 3d at 428, citing *Clifton*, slip op. at 52-54, and *Carney*, 317 Ill. App. 3d at 813.

But *cf. People v. Sutherland*, 317 Ill. App. 3d 1117, 1130-31 (2000), *People v. Primm*, 319 Ill. App. 3d 411, 428 (2000), *People v. Hayes*, 319 Ill. App. 3d 810, 820 (2001), and *People v. Lucas*, 321 Ill. App. 3d 49, 54 (2001) (holding that section 5—8—4(a) does not violate *Apprendi* and, therefore, is constitutional).

Like the courts in *Harden, Clifton*, and *Carney*, we also find section 5—8—4(a) to be unconstitutional. In analyzing section 5—8—4(b), therefore, we employ the same reasoning that we used in analyzing section 5—8—4(a) in those prior decisions. Namely, we must decide whether section 5—8—4(b) requires a factual finding to be made by a trial judge, and not the finder of fact, that would increase the penalty for a crime or trigger consecutive sentencing provisions, thereby rendering it invalid under *Apprendi*. If a trial court is to apply section

5—8—4(b), we find that it must first clear two hurdles: (1) the offenses must not be carried out in a single course of conduct[1]; and (2) a determination must be made, with regard to the nature and circumstances of the offense and the history and character of the defendant, that consecutive sentences are required to protect the public from further criminal conduct by the defendant.

We find that these two requirements are also factual findings that are made by the trial court—not the trier of fact—that will effectively increase a defendant's sentence. Indeed, a finding that offenses were not committed in a single course of conduct is as much a factual finding as if the court were to determine that the offenses *were* committed in a single course of conduct. Under *Harden, Clifton,* and *Carney,* such a requirement in itself violates the strictures of *Apprendi.* However, we also believe that a finding that the public would be protected through the imposition of consecutive sentencing also fits the conduct prohibited under *Apprendi,* much like the finding of severe bodily injury in section 5—8—4(a). Accordingly, we find that the consecutive sentencing provisions of section 5—8—4(b) are unconstitutional.

For the reasons set forth, we affirm defendant's convictions for first degree murder, armed robbery, and aggravated kidnaping, but vacate his sentences and modify the defendant's sentence to provide that those sentences shall run concurrently.

Affirmed as modified.

QUINN, P.J., concurs.

JUSTICE THEIS, specially concurring:

I completely agree with the majority's analysis in this case, except for its holding regarding the admission of gang evidence. Our supreme court has recently addressed this issue, once again recognizing that "street gangs are regarded with considerable disfavor by other segments of our society." *People v. Strain,* 194 Ill. 2d 467, 477, 742 N.E.2d 315, 320 (2000). Moreover, the court has acknowledged that "particu-

---

[1]In *People v. Porter,* 277 Ill. App. 3d 194, 198 (1995), this court stated, "[subsection (b)] has been interpreted as applying only where the multiple convictions do not arise out of a single course of conduct. (*People v. Cooper* (1992), 239 Ill. App. 3d 336, 360, 606 N.E.2d 705.) Where, as here, the convictions arise out of a single course of conduct during which there was no substantial change in the criminal objective, the trial court's authority to impose consecutive rather than concurrent sentences is determined by section 5—8—4(a) of the Unified Code of Corrections. 730 ILCS 5/5—8—4(a) (West 1992)."

larly in metropolitan areas, there may be strong prejudice against street gangs." *Strain*, 194 Ill. 2d at 477, 742 N.E.2d at 320.

Evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial value. *People v. Gonzalez*, 142 Ill. 2d 481, 487, 568 N.E.2d 864, 866 (1991). In this case, the majority finds the evidence of gang membership was relevant to the issue of a common scheme of conducting an armed robbery. However, whether the robbers were accountable for the actions of the others was never in dispute. Rather, the theory of defense was that defendant was not present and did not in fact commit the crime.

The majority also finds the gang evidence was relevant because the crime was committed at the "behest" of Nose. First, defendant's state of mind and motivation in the armed robbery was never an issue for the jury to decide. Second, I believe the majority has overstated the record. There was no evidence that gang hierarchy or discipline motivated defendant to join Nose when he said, "We got to hit a lick." Unlike other cases allowing gang evidence, there was no evidence of gang warfare or gang retaliation *(Strain*, 194 Ill. 2d at 479, 742 N.E.2d at 322), no invasion of rival gang territory *(People v. Colon*, 162 Ill. 2d 23, 30, 642 N.E.2d 118, 121 (1994)), no gang signs flashed or gang slogans shouted *(People v. Jones*, 259 Ill. App. 3d 905, 911, 632 N.E.2d 293, 297 (1994)), and no evidence victims were chosen because they were rival gang members *(People v. Ellis*, 315 Ill. App. 3d 1108, 1120, 735 N.E.2d 736, 746 (2000)).

I believe the questionable probative value of defendant's gang membership, and especially his gang nickname, "Big Murder," was substantially outweighed by its obvious strong prejudicial value. While I would find the trial court erred, I would also hold such error was harmless in light of the overwhelming evidence against defendant. *People v. Parker*, 311 Ill. App. 3d 80, 92, 724 N.E.2d 203, 212 (1999). I write specially to make clear gang evidence should not be admitted in every case where defendants act in concert.